## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| ANNIE LAURIE GAYLOR; DAN BARKER; IAN GAYLOR, Personal Representative of the estate of ANNE NICOL GAYLOR; AND FREEDOM FROM RELIGION FOUNDATION, INC., <br><br>     *Plaintiffs*, <br><br>  v. <br><br>JACOB LEW, Secretary of the United States Department of Treasury; JOHN KOSKINEN, Commissioner of the Internal Revenue Service; and the UNITED STATES OF AMERICA, <br><br>     *Defendants*. | Case No. 16-CV-215 |

## MEMORANDUM IN SUPPORT OF
## PROPOSED INTERVENORS' MOTION TO INTERVENE

Proposed Intervenors consist of Bishop Edward Peecher and Chicago Embassy Church, Father Patrick Malone and Holy Cross Anglican Church, and the Diocese of Chicago and Mid-America of the Russian Orthodox Church Outside of Russia. Intervenors represent a variety of denominations and serve diverse congregations. Yet all share something in common: The parsonage allowance, 26 U.S.C. § 107(2), facilitates their ministry to their congregations and larger communities. It allows the minsters to live near the communities they serve. It allows them to spend the modest tithes from their congregations on the vital ministries and programs that they sponsor. Intervenors will suffer significant financial harm and consequent harm to their ability

to carry out their religious missions and engage in core First Amendment activities should Plaintiffs succeed in this lawsuit.

Plaintiffs Freedom From Religion Foundation ("FFRF"), FFRF Co-Presidents Annie Laurie Gaylor and Dan Barker, and Ian Gaylor, personal representative of the estate of Anne Nicol Gaylor, have sued Defendants Lew, Koskinen, and the United States in an effort to have the agency that Lew directs, the IRS, begin taxing the housing allowances that churches and ministers like Intervenors pay and receive. Intervenors seek to protect their ability to continue serving their diverse congregations and larger communities without the burdens to their religious missions that stripping them of the parsonage allowance would impose, and therefore oppose FFRF's lawsuit. As the real parties in interest, Intervenors now move for leave to intervene as of right under Fed. R. Civ. P. 24(a)(2). Alternatively, they seek permissive intervention under Rule 24(b). Plaintiffs and Defendants have not yet taken a position on this motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Proposed Intervenors.*

*Bishop Edward Peecher and Chicago Embassy Church*

Bishop Edward Peecher ("Bishop Ed") is the founding pastor of Chicago Embassy Church in the Englewood neighborhood on the South Side of Chicago, Illinois. Bishop Ed Decl. ¶ 2. Chicago Embassy Church is a member of the Illinois District Council of the Assemblies of God USA. *Id.* ¶ 3. Bishop Ed leads a predominantly African-American congregation of about 200 people. *Id.* ¶ 3. He has pastored this congregation and

community for over 30 years. *Id.* ¶ 2. To facilitate his ministry to the Englewood community, Bishop Ed lives in nearby Bronzeville. *Id.* ¶ 4. Bishop Ed and his Church are deeply involved in serving the people of Englewood: They have supported a youth tutoring and mentoring program, a community food distribution program, a drug rehabilitation program, and a homeless shelter for women. *Id.* ¶ 9. Bishop Ed is a central figure in the "Chicago Peace Campaign," a ministry where he and members of the Church pray on the street corners of the most violent sections of Englewood at the most violent times. *Id.* ¶¶ 10, 12. They pray with youth who are current or potential gang members and offer them an alternative to violence. *Id.* ¶ 10. The Peace Campaign has resulted in as much as an 11% reduction in violent crime in those neighborhoods. *Id.*

To facilitate his living among the congregation and community that he serves, Bishop Ed receives a housing allowance as part of his compensation that he excludes from his gross income pursuant to § 107(2). *Id.* ¶¶ 13-14. Bishop Ed uses his home to fulfill his pastoral duties. *See id.* ¶ 7. He invites members of the Church into his home for individual spiritual counseling, prayer meetings, and social events. *Id.* Bishop Ed's pastoral team meets in his home, and he prepares his sermons in his home office. *Id.* The parsonage allowance also allows him to devote himself full-time to the ministry, which is critical because the Church and its community programs in Englewood require his full-time commitment. *Id.* ¶¶ 12, 14, 17. Without the parsonage allowance, Bishop Ed would likely have to take a part-time job to cover the increased tax burden.

*Id.* ¶ 17. Alternatively, if the Church were to increase his pay to compensate for the tax, the Church would need to cut back its vital community ministries. *Id.* ¶¶ 18-19.

*Father Patrick Malone and Holy Cross Anglican Church*

Father Patrick Malone is the rector of Holy Cross Anglican Church ("Holy Cross") in Waukesha, Wisconsin. Fr. Malone Decl. ¶ 2. Holy Cross is a member of The Anglican Church of North America and under the diocese of CANA East, the diocese of the Convocation of Anglicans in North America that covers the eastern half of the United States. *Id.* at ¶ 3. There are 65 active members of the church who regularly attend Sunday worship services. *Id.* Father Malone is responsible for leading worship services at Holy Cross as well as counseling individuals both in and out of the parish who are dealing with spiritual or temporal challenges. *Id.* ¶¶ 2, 9. He has over 25 years of pastoral and ministry experience. *Id.* ¶ 2.

Father Malone receives a housing allowance as part of his compensation that he excludes from his gross income pursuant to § 107(2). *Id.* ¶ 11. Without the parsonage allowance, Father Malone could not support his family and would have to seek additional employment, or leave Holy Cross altogether. *Id.* ¶ 15. Because Holy Cross is a church of very modest means, the church would not be able to increase Father Malone's housing allowance to compensate for the increased tax burden without becoming insolvent. *Id.* ¶¶ 15-16. Trying to do so would likely force Holy Cross to close. *Id.* ¶ 16.

*The Diocese of Chicago and Mid-America of the Russian Orthodox Church Outside of Russia*

The Diocese of Chicago and Mid-America of the Russian Orthodox Church Outside of Russia ("Diocese") consists of 42 parishes and 4 monasteries and covers sixteen states—stretching from Canada to Mexico, and from the Ohio and Mississippi rivers to the Rocky Mountains. Fr. Gregory Decl. ¶ 6. "For an Orthodox priest, 'the most precious calling on earth is to participate in the salvation of men's souls.'" *Id.* ¶ 7 (quoting *Guidelines for Clergymen of the Russian Orthodox Church Outside of Russia*, ¶ 2). To do so, a priest must be present to lead multiple divine services every week, *id.* ¶ 8, and is called to counsel his flock and visit the sick regardless of the day of the week or the time of day that the need may arise, *id.* ¶ 13.

The Diocese has eight clergy who live in church-owned parsonages and 13 clergy who receive housing allowances. *Id.* ¶ 20. The parsonage allowance is important to clergy in the Diocese because of their unique housing needs. Russian Orthodox priests must serve in whatever parish the Bishop assigns them and are required by Church regulations to live within the geographic boundaries of that parish so that they can be available day or night to care for their flock. *Id.* ¶¶ 13, 16-18. The majority of parishes in the Diocese have budgets of less than $100,000, and most priests are bi-vocational—meaning they work secular jobs to support their families. *Id.* ¶¶ 22-23. Striking down the parsonage allowance would place a severe financial strain on the parishes' ability to provide for their clergy and would likely force some priests to cut back on their priestly work to take additional secular work. *Id.* ¶ 26.

### *The parsonage allowance and the present conflict.*

Under the Internal Revenue Code, many types and sources of compensation are excluded from the calculation of a taxpayer's "gross income." *See generally* 26 U.S.C. §§ 101-139f. One such exclusion, known as the parsonage allowance, applies to "a minister of the gospel," for whom "gross income does not include (1) the rental value of a home furnished to him as part of his compensation; or (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home and to the extent such allowance does not exceed the fair rental value of the home, including furnishings and appurtenances such as a garage, plus the cost of utilities." § 107.

In 2011, FFRF sued Defendants in this Court claiming that § 107 violates the Establishment Clause of the First Amendment to the United States Constitution. *See* Compl., *Freedom from Religion Found., Inc. v. Lew*, No. 3:11-cv-626-bbc (W.D. Wis. Sept. 13, 2011), ECF No. 1. Plaintiffs alleged that they "each receive a designated housing allowance from the plaintiff FFRF but the housing allowances do not qualify for income tax exclusion because the individual plaintiffs are not practicing religious clergy." *Id.* ¶ 3. This Court dismissed FFRF's challenge to § 107(1) because Plaintiffs lacked standing. *Freedom from Religion Found., Inc. v. Lew*, 983 F. Supp. 2d 1051, 1053 (W.D. Wis. 2013). However, this Court concluded that Plaintiffs had standing to challenge § 107(2), agreed with FFRF that § 107(2) was unconstitutional, and enjoined Defendants from enforcing it. *Id.* at 1053, 1073. Defendants appealed to the Seventh Circuit, where a panel concluded that, because Plaintiffs had never claimed

the exemption under § 107(2), they had not suffered an injury, and consequently lacked standing to challenge the statute's constitutionality. *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 825 (2014). The Seventh Circuit vacated this Court's judgment and instructed this Court to dismiss Plaintiffs' complaint. *Id.*

On April 6, 2016, Plaintiffs filed this second challenge to § 107 in this Court, this time alleging that they "have been denied refunds of taxes paid on their housing allowance." Compl. ¶ 3, ECF No. 1. Though not mentioned in the Complaint, FFRF issued a press release the same day as the Complaint indicating that Plaintiffs Annie Laurie Gaylor and Dan Barker *received* refunds from the IRS for one of the two years that they requested them. *See* Exhibit 1. On August 12, Defendants moved this Court to dismiss Plaintiffs' challenge to § 107(1) for lack of jurisdiction, but conceded Plaintiffs' standing to challenge § 107(2). Br. Supp. Mot. to Dismiss, at 2 n.2, ECF No. 7 (Aug. 12, 2016). On October 24, this Court granted Defendants' partial motion to dismiss the § 107(1) claim. Defendants then filed their answer on November 7, in which they again conceded that Plaintiffs have standing to challenge § 107(2). Answer ¶ 2, ECF No. 17 (Nov. 7, 2016).

The Intervenors now seek intervention to protect their threatened rights.

## STANDARD OF REVIEW

In evaluating a motion to intervene, courts "must accept as true the non-conclusory allegations" made by the proposed intervenor, *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995), and "should avoid rigid construction of Rule 24." *Jessup v. Luther*, 227 F.3d 993, 998 (7th Cir. 2000).

# ARGUMENT

## I.   The Intervenors should be granted intervention as of right.

Fed. R. Civ. P. 24(a)(2) permits intervention as of right if: "(1) the application is timely; (2) the applicant has an 'interest' in the property or transaction which is the subject of the action; (3) disposition of the action as a practical matter may impede or impair the applicant's ability to protect that interest; and (4) no existing party adequately represents the applicant's interest." *United States v. Thorson*, 219 F.R.D. 623, 626 (W.D. Wis. 2003) (quoting *Security Ins. Co. of Hartford v. Schipporeit*, 69 F.3d 1377, 1380 (7th Cir. 1995)). "A motion to intervene as a matter of right . . . should not be dismissed unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint." *Reich*, 64 F.3d at 321, (quoting *Lake Inv'rs Dev. Group v. Egidi Dev. Group*, 715 F.2d 1256, 1258 (7th Cir. 1983)). The Intervenors meet each of the criteria and should be allowed to intervene as of right.

### A.   The Intervenors have a protectable interest in the subject of the action.

The Intervenors are entitled to intervene because they are the intended beneficiaries of the statute that FFRF seeks to invalidate. Striking down § 107(2) would cause Intervenors direct, substantial financial harm. Intervenors would feel this financial harm far more acutely than would a business merely devoted to improving its "bottom-line." For Intervenors, losing the parsonage allowance will hinder their

ability to carry out their religious missions to the diverse congregations and communities that they serve, and will require them to reduce their core First Amendment activities.

To determine whether a protectable interest is at stake, courts "focus on the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues." *Reich*, 64 F.3d at 322. Courts have "embraced a broad definition of the requisite interest" sufficient to justify intervention, *Lake Investors*, 715 F.2d at 1259, requiring only that it be a "direct and substantial" interest, *id.*, in a "legally protected right that is in jeopardy and can be secured" by intervention. *Aurora Loan Srvs., Inc. v. Craddieth*, 442 F.3d 1018, 1022 (7th Cir. 2006).

Here, the Intervenors have legally protectable interests in this lawsuit. Bishop Ed, Father Malone, and the Diocesan priests receive tax-exempt housing allowances pursuant to § 107(2). Bishop Ed Decl. ¶ 13; Fr. Malone Decl. ¶ 11; Fr. Gregory Decl. ¶ 27. This alone would satisfy the "direct and substantial" interest requirement. *See Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 572 (7th Cir. 2009) (recognizing that "the 'interest' required for intervention as a matter of right" requires that the intervenor "be someone whom the law on which his claim is founded was intended to protect").

Without § 107(2), Bishop Ed and Chicago Embassy Church would suffer significant financial harm. *See* Bishop Ed Decl. ¶¶ 17-19. Bishop Ed would have to pay taxes on roughly $3,000 per month of income. *See id.* ¶ 13. This would significantly increase his taxable income, *id.* ¶ 17, and could make it difficult for him to make his mortgage

payments—a mortgage he and his wife qualified for only because of his housing allowance, *id.* ¶¶ 13-14. Such a strain on his family's finances would likely force him to reduce the time he spends ministering to his Church and serving the community in order to take on a part-time job. *Id.* ¶ 17. Increasing Bishop Ed's housing allowance to compensate for the tax would put a significant strain on the Church's finances. *Id.* ¶ 18. His housing allowance represents about a quarter of the Church's personnel budget. *See id.* ¶¶ 13, 19.

Moreover, for Bishop Ed and Chicago Embassy Church, taxing the housing allowance threatens their religious mission to minister to Chicago's South Side. *Id.* ¶¶ 18-19. The Church's numerous community programs—which have included a youth mentoring program, feeding the hungry, praying and ministering to gang members to reduce violence, a drug rehabilitation program, and supporting a women's homeless shelter, *id.* ¶ 9-11—are "a fundamental part of [Bishop Ed's] calling to the ministry," *id.* ¶ 12, and of how the Church lives its Christian faith, *id.* ¶ 19. If Bishop Ed is forced to take a part-time job, he will have to divert his time from those community programs to which his "full-time participation is critical." *Id.* ¶ 12. And if the Church bears the tax burden, it will have to divert financial resources away from these same vital programs. *Id.* ¶¶ 18-19. "The Church considers it a sacred duty to use the members' tithes to bless people's lives." *Id.* ¶ 18. That is why it spends more than half of its budget on these programs and strives to operate frugally by, for example, keeping

its personnel budget to a quarter of the total budget, and even by meeting in an inexpensive nearby rental facility during the winter so it can turn down the temperature in the Church. *Id.* ¶ 19.

Similarly, Father Malone would have to pay taxes on roughly $1500 per month without the parsonage allowance. Fr. Malone Decl. ¶ 11. Given that this represents half of his total pay from Holy Cross, he would not be able to support his family under those circumstances. *Id.* ¶ 15. Unless Holy Cross could increase his pay to account for the major tax increase, he would either have to take on additional work or leave the parish altogether. *Id.* Holy Cross "is already on a shoestring budget" of only $50,000 per year and simply "would not be able to increase [his] housing allowance to compensate for the additional tax." *Id.* ¶¶ 12, 16.

If Holy Cross lost Father Malone as its vicar, the church members would have no one to minister the Sacraments of Baptism and weekly Communion to them. *See id.* ¶¶ 5-7. "Only a priest who has been called to the ministry may minister these sacraments." *Id.* ¶ 7. For Anglicans, "[b]aptism unites to Christ in his death, burial and resurrection, and brings about a fellowship with others in union with him. But sin causes discord in that union. Thus, each member of the congregation needs weekly communion to reestablish and reaffirm that union and receive the forgiveness of sin." *Id.* ¶ 6. Even if Holy Cross were able to find another priest, its members would have already lost the opportunity to fully live their faith during the time they had no priest. "For the Church to be spiritually healthy, it needs the *constant* presence of a priest

to minister to each person." *Id.* ¶ 7 (emphasis added). And faced with the necessity of shouldering the tax burden, Holy Cross would probably have to close down. *Id.* ¶ 16.

The Diocese (along with its priests) would also suffer financial harm without the parsonage allowance. Priests in the Diocese would be forced to pay income tax on an aggregate $125,000 or more per year, cutting their "already meager salaries." Fr. Gregory Decl. ¶ 26. Most parishes could not afford to increase their priests' compensation to offset the additional tax, as most parishes already "cannot afford to provide enough salary to support a priest and his family." *Id.* ¶ 23. Even with a tax-exempt parsonage allowance, most priests in the Diocese already have to divide their time between priestly duties and secular employment, and taxing their housing allowances would force them "to further cut back their priestly work in order to take additional secular work." *Id.* ¶ 26. For example, for Father Gregory Joyce, who serves as the Secretary of the Diocesan Council and as the rector of St. Vladimir Orthodox Church, losing the parsonage allowance would reduce his take-home pay by as much as a third. *Id.* ¶¶ 2, 5, 28. After approximately seventeen years of having to divide his time between his priestly duties and a secular job (while still trying to make time for his wife and children), Father Gregory was finally able to devote himself full-time to the ministry about two and a half years ago. *Id.* ¶ 23. Losing the parsonage allowance would likely require him to find a part-time job. *Id.* ¶ 28.

The Diocese would also face threats to its religious mission. "Gathering with fellow believers to participate in divine services is a fundamental part of Orthodox worship and of '[w]hat is necessary for the spiritual perfection of the faithful.'" *Id.* ¶ 8 (quoting

*Guidelines for Clergymen of the Russian Orthodox Church Outside of Russia*, ¶ 7). "The priest appears as a mediator between God and men and the means of the distribution of the Holy Spirit's gifts of grace," *id.* ¶ 9 (quoting *Guidelines for Clergymen*, ¶ 3), and only the priest "can perform the divine services and the Mysteries of Confession and Communion." *Id.* "Thus if a parish lacks a priest and goes without Holy Communion, it does not take long for that parish to fall apart spiritually." *Id.* Priests in the Diocese who have secular employment already "are often unable to offer the required services on important holy days that fall on weekdays." *Id.* ¶ 24. "In 2016, eight of the twelve Great Feasts fall on weekdays." *Id.* ¶ 11. Some priests are forced to hold services at 6 am or midnight in order to maintain their secular jobs. *Id.* ¶ 24. Priests also have the responsibility to ensure that none of their parishioners "dies without a final confession and the Holy Mysteries of Christ." *Id.* ¶ 15. Secular employment makes it more difficult for a priest to "drop whatever [he] is doing to respond to a parishioner who is ill and at risk of dying." *Id.* Forcing priests to take on additional secular work would take away even more from the time that they can spend performing their pastoral duties, and magnify the risk of the "great spiritual tragedy" that would occur if the priest "did not make it in time and one of [his] parishioners died without a final confession." *Id.*

Thus, for the Intervenors, losing the parsonage allowance would restrict, minute for minute, dollar for dollar, the modest resources that they have to carry out their religious missions. This is more than sufficient to establish a cognizable interest under Rule 24. Courts have permitted far less concrete interests, such as that of timber

13

companies that intervened "in an action to bar logging in a national forest even though they had no logging contracts and merely wanted an opportunity to bid for such contracts in the future." *City of Chicago. v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 986 (7th Cir. 2011) (citing *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969-70 (3d Cir. 1998)). Indeed, this case presents the "strongest case for intervention" because it is not a case "where the aspirant for intervention could file an independent suit, but where the intervenor-aspirant has no claim against the [opposing party] yet [still has] a legally protected interest that could be impaired by the suit." *Habitat Educ. Ctr., Inc. v. Bosworth*, 221 F.R.D. 488, 494 (E.D. Wis. 2004) (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 507 (7th Cir. 1996)). Intervenors have no stand-alone claim against FFRF; their only interest is in keeping FFRF from obtaining its stated goal of forcing the IRS to stop allowing ministers and churches like them from utilizing the parsonage allowance.

### B. Intervenors' ability to protect their interests may be impaired by the disposition of this action.

Rule 24 requires "only that, as a practical . . . matter, [the Intervenors'] interest *could be* impaired." *Bosworth*, 221 F.R.D. at 492-93 (emphasis added). And "demonstrat[ing] the direct and significant nature of [the Intervenors'] interest" often alone "meets the impairment prong of Rule 24(a)(2)." *Reich*, 64 F.3d at 323. As the advisory committee explained, "[i]f an [intervenor] would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." Fed. R. Civ. P. 24, advisory committee's note.

14

Here, there is no doubt that if the FFRF prevails and the Court strikes down the parsonage allowance, Intervenors will suffer immediate financial harm. The first time that FFRF challenged the parsonage allowance, this Court entered an injunction that, had its decision not been vacated, would have required the IRS to begin taxing the housing allowances of Intervenors who utilize § 107(2). This financial harm will impair the Intervenors' ability to carry out their religious missions and to fully engage in core First Amendment activities. Even if the Court were to restrict the geographic scope of an injunction, Intervenors would still be harmed: All Intervenors reside in the jurisdiction of the United States Court of Appeals for the Seventh Circuit. Bishop Ed Decl. ¶¶ 2, 4; Fr. Malone Decl. ¶¶ 2, 10; Fr. Gregory Decl. ¶ 6. If this case is appealed to the Seventh Circuit, the *stare decisis* effect of an unfavorable Seventh Circuit decision would make it even more difficult for Intervenors to protect their rights. *See Lake Investors*, 715 F.2d at 1260 ("As this court has recently noted, 'impairment' exists if the decision of a legal question would, as a practical matter, foreclose rights of the proposed intervenor in a subsequent proceeding; foreclosure is to be measured in terms of *stare decisis*.").

It is no answer to say that Intervenors could defend their interests by filing a separate action against the IRS. Because the IRS has not yet sought to tax Intervenors' housing allowances, a separate suit would likely be barred by the Tax Anti-Injunction Act, which generally blocks taxpayers from suing the IRS to enjoin the collection of taxes. *See* 26 U.S.C. § 7421(a).

Even assuming Intervenors could file a separate action *after* this Court were to strike down the parsonage allowance, the availability of a separate action "has been held not to be an automatic bar to intervention." *City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 985-86 (7th Cir. 2011); *id.* at 987 ("[P]reclusion is not a condition of intervention.") Rather, the rule focuses on "the practical effect of denying intervention." *Id.* Here, forcing Intervenors to wait until the core constitutional issue in this case has been resolved against them would compromise their ability to protect their rights. First, the judgment and injunction from this Court would still bind the IRS. *See United States v. City of Chicago*, 870 F.2d 1256, 1262 (7th Cir. 1989) (recognizing that the potential for inconsistent judgments could subject government defendant to contempt and thus created practical obstacles to proposed intervenors protecting their rights in a separate action). Second, the Tax Anti-Injunction Act would likely still require the individual ministers to pay a heavy tax and sue for a refund after the fact if they wanted to proceed in an Article III court. In the meantime, Intervenors would suffer harms that a subsequent refund could never repair: Bishop Ed and Chicago Embassy Church would have to cut back on their crucial community ministries; Holy Cross would face a risk of closure; and priests in the Diocese would be forced to obtain additional secular employment. Money cannot repair the spiritual and temporal harm that may befall their parishioners in their priests' absence.

Intervention is a simple, efficient way to prevent these harms. Accordingly, this factor also weighs heavily in favor of granting intervention.

**C. The Intervenors' interests are not adequately represented by the existing parties to the action.**

The Court should allow this intervention because Defendants cannot adequately represent Intervenors' interests in this case. This factor presents a low hurdle: the Intervenors need not show that, in fact, their interests are not being adequately represented, only that "representation of [their] interest 'may be' inadequate[.]" *Thorson*, 219 F.R.D. at 627 (quoting *Lake Investors*, 715 F.2d at 1261); *accord Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). And courts must treat "the burden of making that showing . . . as minimal." *Thorson*, 219 F.R.D. at 627 (quoting *Lake Investors*, 715 F.2d at 1261). If an existing party's interests "are related, but not identical" to the Intervenors', the Court cannot simply presume that the Intervenors are adequately represented. *Trbovich*, 404 U.S. at 538-39 & n.10 (articulating the "may be inadequate" standard and applying it with no presumption of adequacy).

Here, Defendants cannot adequately represent the Intervenors because Defendants have "substantive interests at variance" with those of the Intervenors. *See Solid Waste Agency*, 101 F.3d at 508 (citing *Trbovich*, 404 U.S. at 538-39); *see also Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 594 (7th Cir. 1993) ("[a]dequate representation of the same legal interests necessarily entails the absence of conflicts of interest" when determining whether prior litigation had *res judicata* effect on non-party). Intervenors face serious, and even ruinous, financial harm if the parsonage allowance is struck down. Defendants, by contrast, will *benefit* financially—to the tune of some $800 million in additional tax revenue each year. *See* Staff of the Joint

17

Committee on Taxation, Estimates of Federal Tax Expenditures for Fiscal Years 2015-2019 (Comm. Print 2015) at Table 1. The United States, through the agencies run by Defendants Lew and Koskinen, will collect the very taxes that could seriously curtail the vital community ministries run by Bishop Ed and Chicago Embassy Church, shut down Father Malone's ministry at Holy Cross, and force priests in the Diocese to restrict the time they spend on priestly duties.

Next, the Intervenors are also uniquely situated to provide information and offer arguments to the Court from the perspective of ministers and churches who actually *use* the parsonage allowance and who would be harmed if it were struck down. *Cf. Trbovich*, 404 U.S. at 538–39 (holding that a government party did not adequately represent intervenors because its commitment to defend the public interest "transcends the narrower interest" of the intervenors). Intervenors can provide the Court with concrete facts about the unique housing needs of ministers and the particular hardships that they would face without the parsonage allowance—critical facts for the Court to consider when determining whether the parsonage allowance is "warranted by some overarching secular purpose." *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 14-15 n.4 (1989) (plurality). Defendants do not have this information and, given that they do not share Intervenors' religious interests and face no harm if the parsonage allowance were to be struck down, would have little incentive to present it if they did. *See Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 205 (7th Cir. 1982) (identifying "potential strategic differences" between existing party and intervenors as evidence of inadequate representation). If the Court continues without

the Intervenors, it will decide a major constitutional issue with financial implications amounting to hundreds of millions of dollars without the voice of those who are the actual parties in interest who could present the most relevant facts and who stand to be harmed the most.

Additionally, counsel for the Intervenors litigate extensively on First Amendment grounds in state and federal courts throughout the country, and thus are capable of presenting information and arguments that may shed additional light on the constitutional issues before the Court. Counsel for Intervenors have frequently represented intervenors in Establishment Clause litigation alongside federal, state, and local government entities. *See, e.g.*, *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007 (9th Cir. 2010) (in Establishment Clause challenge, adopting argument of proposed Defendant-Intervenors); *Freedom from Religion Found. v. Weber*, 628 Fed. App'x 952 (9th Cir. 2015) (unpublished) (same).

Finally, Intervenors are not adequately represented in this case because both Plaintiffs and Defendants have failed to disclose important facts that cast doubt on the Court's jurisdiction. The sole basis of Plaintiffs' supposed standing is their allegation that they have been denied tax benefits in violation of the Establishment Clause because they are not religious clergy. In support of this allegation, Plaintiffs state that "[t]he individual plaintiffs each received housing allowances . . . in 2012 and 2013," Compl. ¶ 11, ECF No. 1; "paid taxes thereon," *id.* ¶ 14; "subsequently filed Amended Individual Tax returns, seeking a refund," *id.* ¶ 15; and were "denied . . . the refund sought by plaintiffs Annie Laurie Gaylor and Dan Barker, for the tax year

2012." Compl. ¶ 16. Defendants admit the substance of these key allegations. *See* Answer ¶¶ 11, 13, 15, 16.

What the parties have failed to tell the Court is that, according to an FFRF press release, the IRS *granted* the refund that Plaintiffs Annie Laurie Gaylor and Dan Barker requested for the tax year 2013. *See* Exhibit 1. If the IRS has determined that FFRF employees like Plaintiffs Annie Laurie Gaylor and Dan Barker qualify for the parsonage allowance, it casts serious doubt on whether the denial of the 2012 refunds is traceable to an alleged violation of the Establishment Clause, and whether enjoining the IRS from enforcing the parsonage allowance could redress Plaintiffs' alleged injury.

It is equally unclear that Plaintiff Ian Gaylor has standing as the personal representative of the estate of Anne Nicol Gaylor. Plaintiffs allege, and Defendants admit, that the IRS has not taken action on the refund that the late Anne Nicol Gaylor requested for the tax year 2013. *See* Compl. ¶ 17; Answer ¶ 17, ECF No. 17. Yet the complaint fails to plead any facts to support an inference that the Defendants' allegedly unconstitutional application of § 107(2) caused any delay in processing the amended tax return. The answer does nothing to clarify this, asserting that Defendants (including the Commissioner of Revenue) "lack knowledge or information sufficient to form a belief as to the truth of" the status of Anne Nicol Gaylor's 2013 amended tax return. Answer ¶ 17. Absent a denial of Anne Nicol Gaylor's refund, or a plausible allegation that Defendants are refusing to process it *because* Anne Nicol Gaylor was a non-believer, her estate's claim is not ripe, the alleged injury is not

traceable to an alleged Establishment Clause violation, and the declaratory and injunctive relief that Plaintiffs seek will not redress the alleged injury.[1] Defendants failed to raise these arguments, instead agreeing that Plaintiff Ian Taylor has standing to challenge § 107(2). *See* Br. Supp. Mot. to Dismiss, at 2 n.2; Answer ¶ 2.

Whether the Defendants' failure to present these facts and arguments to the Court is due to an oversight or otherwise is irrelevant. *See Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774 (7th Cir. 2007) ("a showing of gross negligence *or* bad faith" destroys even a presumption of adequate representation) (emphasis added); *Meridian Homes Corp.*, 683 F.2d at 205 ("collusion," "*or* potential strategic differences," "*or any other* substantial divergence of interests" demonstrates inadequate representation) (emphasis added). Either way, Defendants have demonstrated that they do not adequately represent the Intervenors' interests.

### D. The Intervenors' motion to intervene is timely.

The "test for timeliness is reasonableness": courts look to see if the intervenors have been "reasonably diligent in learning of a suit that might affect their rights" and have acted "reasonably promptly" to intervene "upon so learning." *Thorson*, 219 F.R.D. at 627 (quoting *Reich*, 64 F.3d at 321). The mere passage of time is not the dispositive factor when courts decide whether a motion to intervene is timely; "the most important consideration . . . is whether the delay in moving for intervention . . . will prejudice the existing parties to the case." *Id.* at 627-28 (quoting *People Who Care*

---

[1] And because FFRF's standing is entirely derivative of the individual Plaintiffs', FFRF likewise lacks standing to pursue this claim.

*v. O'Brien,* 68 F.3d 172, 176 (7th Cir.1995)). And courts consider not only "the preju-

dice to the original parties if intervention is permitted" but also "the prejudice to the

intervenor if his motion is denied." *Reich*, 64 F.3d at 321 (citing *Shea v. Angulo*, 19

F.3d 343, 349 (7th Cir. 1994)).

Granting intervention here will not work any prejudice to the existing parties.

Indeed, the slim docket sheet here shows that the primary action in the case con-

cerned the motion to dismiss, which was resolved only seven weeks ago. *See* Order,

ECF No. 15 (Oct. 24, 2016 Order granting motion to dismiss challenge to 26 U.S.C. §

107(1) for lack of standing). The government has only filed its answer. *See* Answer,

ECF No. 17 (Nov. 7, 2016). Neither party has filed any dispositive motions on the

merits nor conducted any discovery. At this early stage in the case, allowing inter-

vention will not require any change to the Court's existing scheduling order.

The motion presents no other timeliness problems. It is being filed just six weeks

after Bishop Ed and Chicago Embassy Church first learned of FFRF's lawsuit, Bishop

Ed Decl. ¶ 20, and only two months since the other Intervenors learned of it, Fr.

Malone Decl. ¶ 17, Fr. Gregory Decl. ¶ 33, and Intervenors quickly took steps to be

able to intervene, Bishop Ed Decl. ¶ 22, Fr. Malone Decl. ¶ 20, Fr. Gregory Decl. ¶ 35.

Thus, measuring "from the time the [Intervenors] learn[ed] that their interests might

be impaired," *Reich*, 64 F.3d at 321, the timeliness standard is met. By comparison,

courts have allowed intervention nineteen months after learning of a lawsuit, *id.*,

after a final judgment had been rendered and just days before the deadline for appeal

ran out, *Flying J*, 578 F.3d at 571-72, and eight years after a consent decree was

entered, *United States v. City of Chicago*, 870 F.2d 1256, 1263 (7th Cir. 1989). *See also Thorson*, 219 F.R.D. at 628–29 (concluding that motion to intervene was timely when it was filed over five months after intervenor learned of the suit and when intervention might delay trial by up to two months).

The timeliness requirement exists "to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." *Aurora Loan*, 442 F.3d at 1027 (quoting *Lefkovitz v. Wagner*, 395 F.3d 773, 778 (7th Cir. 2005)). Here, the Intervenors are not tardy and the lawsuit will not be derailed. The Intervenors' request to intervene should therefore be granted. *See, e.g.*, *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) ("The motion to intervene was made at an early stage of the proceedings, the parties would not have suffered prejudice from the grant of intervention at that early stage, and intervention would not cause disruption or delay in the proceedings. These are traditional features of a timely motion.").

## II. Alternatively, the Intervenors should be permitted to intervene under Rule 24(b).

Even if this Court were to find that the Intervenors cannot intervene as of right, permissive intervention is appropriate. Rule 24(b) authorizes this Court to permit intervention when an applicant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). The determination of whether a party will be able to intervene is within the discretion of the court, which will consider whether it will unduly delay the main action or unfairly prejudice the existing parties. *Id.*

Intervenors easily qualify for permission to intervene in this case. Intervenors' interests in protecting their right to the parsonage allowance, and to prevent the financial harm they would incur without it, presents the same principal question of law as the existing parties' dispute—the constitutionality of § 107(2). It does not seek to introduce any new issue, but only to present further arguments as to why FFRF's claim should fail. As noted above, this motion is timely and intervention will neither require any change to existing deadlines nor prejudice the current parties. The significance of the Intervenors' interests in the subject matter of this litigation outweighs any marginal additional burden that would be caused by intervention. *See City of Chicago*, 660 F.3d at 986 (reversing denial of permissive intervention, noting that a concern about "unwieldy" litigation was insufficient to justify denying intervention, especially where the intervenor promised to streamline its participation). Even if the Court concludes that the Intervenors cannot intervene as of right, it should nonetheless permit intervention under Fed. R. Civ. P. 24(b).

## CONCLUSION

For the foregoing reasons, the Intervenors' motion to intervene should be granted.

Dated: December 13, 2016                 Respectfully submitted,


                                         /s/ Hannah C. Smith
                                         Hannah C. Smith
                                         Luke W. Goodrich
                                         Daniel D. Benson
                                         The Becket Fund for Religious Liberty
                                         1200 New Hampshire Ave. NW, Suite 700
                                         Washington, DC 20036
                                         Email: hsmith@becketfund.org
                                         Telephone: (202) 955-0095
                                         Facsimile: (202) 955-0090

                                         *Counsel for Proposed Intervenors*