## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ANNIE LAURIE GAYLOR; DAN BARKER; IAN GAYLOR, Personal Representative of the estate of ANNE NICOL GAYLOR; AND FREEDOM FROM RELIGION FOUNDATION, INC., | |
| *Plaintiffs*, | |
| v. | |
| JACOB LEW, Secretary of the United States Department of Treasury; JOHN KOSKINEN, Commissioner of the Internal Revenue Service; and the UNITED STATES OF AMERICA, | Case No. 16-CV-215 |
| *Defendants*, | |
| and | |
| EDWARD PEECHER, CHICAGO EMBASSY CHURCH, PATRICK MALONE, HOLY CROSS ANGLICAN CHURCH, AND THE DIOCESE OF CHICAGO AND MID-AMERICA OF THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA, | |
| *Intervenor-Defendants*. | |

## INTERVENOR-DEFENDANTS' REPLY BRIEF IN SUPPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCUTION ...................................................................................................1

ARGUMENT ...........................................................................................................1

I.   Plaintiffs' eleventh-hour attempt to
manufacture standing changes nothing ....................................................1

II. The parsonage allowance is fully consistent with the
Establishment Clause........................................................................3

     A.  The parsonage allowance is consistent with the
historical understanding of the Establishment Clause .........................3

     B.  The parsonage allowance is consistent with the
controlling opinion in *Texas Monthly* ......................................8

     C.  The parsonage allowance is consistent with the
*Texas Monthly* plurality ........................................................ 10

          1.  The parsonage allowance applies the
convenience of the employer doctrine to ministers......................... 11

          2.  The parsonage allowance reduces entanglement ........................... 19

          3.  The parsonage allowance avoids discrimination
among religions ............................................................... 23

CONCLUSION ................................................................................... 25

## INTRODUCTION

The key question in this case is whether § 107(2) must be viewed in isolation or in context. Plaintiffs want the Court to view it in isolation, arguing that because § 107(2) applies only to churches and ministers, it is a "discriminatory preference for religion." Pls.' Br. 2. But "context is all important" under the Establishment Clause. *Cty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 640 (1989) (Brennan, J., concurring and dissenting).

Viewed in context, § 107(2) is not only permissible under the Establishment Clause, but desirable. It is fully consistent with the historical meaning of the Establishment Clause, which strongly supports tax exemptions for ministers' housing. It is fully consistent with the "convenience of the employer doctrine," which allows tens of thousands of secular employees to exclude cash housing allowances from their income. Br. 29. And it is fully consistent with Supreme Court precedent, which requires the government to avoid entanglement in religious questions and avoid discrimination among religions. Plaintiffs' attempt to upset almost a century of settled tax policy should be rejected.

## ARGUMENT

### I.  Plaintiffs' eleventh-hour attempt to manufacture standing changes nothing.

Plaintiffs lack standing because they have failed to demonstrate that they will suffer any continuing harm that would be remedied by an injunction. Their complaint requests only prospective relief: a declaration that § 107(2) is invalid and an injunction striking it down. Compl. at 13, ¶¶ A-D. To obtain such relief, Plaintiffs must

1

show "continuing, present adverse effects" that an injunction would remedy. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

But Plaintiffs have failed to do so. They do not dispute that Anne Nicol Gaylor's estate lacks standing. Because Ms. Gaylor has passed away, there is no "likelihood that [she] will again be wronged in a similar way," *Lyons v. City of Los Angeles*, 461 U.S. 95, 111 (1983), and she cannot benefit from the changes in the tax law that her estate seeks. Accordingly, an injunction cannot redress her alleged injuries. *See, e.g.*, *Platcher v. Health Prof'ls, Ltd.*, No. 04-1442, 2006 WL 1980193, at *4 (C.D. Ill. July 12, 2006).

Annie Laurie Gaylor and Dan Barker fare no better. The IRS has processed two refund requests from Gaylor and Barker, one of which it granted. Int.-Defs' Proposed Findings of Fact, ECF No. 52, ¶¶ 190-91 (hereinafter "Facts"). If the IRS granted one of their prior refund requests, it is speculative to assume that it will deny all such requests in the future. Recognizing this problem, Gaylor and Barker recently filed two new amended tax returns. Pls.' Proposed Findings of Fact, ECF No. 63, ¶ 26. But this changes nothing—the grant of their 2013 refund still makes it unclear whether they "will again be wronged in a similar way." *Lyons*, 461 U.S. at 111.

Unable to establish any "continuing, present adverse effects" to support an injunction, *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974), Plaintiffs change tack, claiming for the first time in their response brief that they *are* seeking a refund in this lawsuit. But it's too late for that. The complaint includes no request for a refund, and Plaintiffs have not amended it. Plaintiffs point to their general request for "such further relief

as the Court deems just and equitable," and ask the Court to interpret it as a request for a refund. Compl. at 13, ¶ D. But a generic, catch-all request for further "*equitable*" relief does not include damages. *Cf. Fox v. Bd. of Trs.*, 42 F.3d 135, 141 (2d Cir. 1994) (declining "to read a damages claim into the Complaint's boilerplate prayer for 'such other relief as the Court deems just and proper'"); *accord Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997) (same). Plaintiffs even claim that portions of their Complaint asking the Court "to enjoin" Defendants were actually requests for damages. *See* Pls' Br. at 9 (citing Compl. ¶ 1 ("Plaintiffs request the Court to enjoin . . . ); Prayer for Relief ¶ C ("enjoining the defendants")). But obviously a request to "enjoin" another party does not refer to damages—it refers to an injunction. Thus, Plaintiffs have requested only an injunction and lack standing to get one.

## II. The parsonage allowance is fully consistent with the Establishment Clause.

Under any of the competing Establishment Clause "tests," the parsonage allowance is constitutional. It is consistent with the historical meaning of the Establishment Clause, with the plurality and concurring opinions in *Texas Monthly*, and with *Lemon.*

### A. The parsonage allowance is consistent with the historical understanding of the Establishment Clause.

The Supreme Court's recent Establishment Clause cases have declined to apply the *Lemon* test and have instead held that "the Establishment Clause *must* be interpreted by reference to historical practices and understandings." *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1819 (2014) (emphasis added; quotation omitted). Even Plaintiffs recognize this, treating the *Lemon* test largely as an afterthought at the

end of their brief. *See* Pls.' Br. 39-40.[1]

At the time of the Founding, an "establishment of religion" consisted of several elements: (1) government control of the doctrine and personnel of the church, (2) government coercion of religious beliefs and practices, (3) government assignment of important civil functions to the church, and (4) government financial support of the church. Br. at 11 (citing Michael McConnell, *Establishment and Disestablishment at the Founding, Part 1: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131, 2145-59 (2003)); *see also Felix v. City of Bloomfield*, 847 F.3d 1214, 1216 (10th Cir. 2017) (Kelly, J., dissenting) (same). The only element relevant here is financial support.

In states with established churches, government financial support took the form of land grants or compulsory taxes or "tithes." McConnell, 44 Wm. & Mary L. Rev. at 2146-59. Notably, these forms of financial support involved a *transfer* of money or land from the government (or from taxpayers) to the church. By contrast, tax exemptions like the parsonage allowance involve no financial transfer. As the Court said in *Walz v. Tax Commission*, a tax exemption "is not sponsorship since the government does not *transfer* part of its revenue to churches but simply abstains from demanding that the church support the state." 397 U.S. 664, 675 (1970) (emphasis added). Not surprisingly, such tax exemptions remained ubiquitous at the time of the Founding—even as the states disestablished their churches—and they were never considered to

---

[1] The parsonage allowance satisfies *Lemon* for the same reasons that it satisfies the *Texas Monthly* plurality. *See* Br. at 47; *infra* Part II.C.

be an element of an establishment. *See Walz*, 387 U.S. at 676-79 (surveying history of religious tax exemptions); *id.* at 681-87 (Brennan, J., concurring) (same).

Plaintiffs do not dispute any of this. Indeed, they admit that "tax exemptions" for churches have a "historical legacy." Pls.' Br. 15. Instead, they argue that this legacy is limited to tax exemptions for "church property," and does not extend to "income tax exemptions for housing." *Id.* But they cite nothing in support of this distinction. Nor can they.

First, this distinction is illogical. Exempting a parsonage from property taxes is no different from exempting a parsonage (or parsonage allowance) from income taxes. Both have the same effect on the church and on the public fisc. There is no basis under the Establishment Clause for treating them differently.

More importantly, Plaintiffs' argument is ahistorical. Ever since the Founding, the government has consistently exempted churches and ministers from taxation on the value of church-provided housing—no matter what form the taxation has taken. At the Founding, the states relied heavily on property taxes to raise revenue. W. Elliot Brownlee, *Federal Taxation in America: A Short History* 15 (2d ed. 1996). Thus, property taxes were the principal way that clergy housing might have been taxed. But rather than tax parsonages, each of the Thirteen States and the District of Columbia expressly excluded church property from taxation.[2]

---

[2] Ch. 29, Pub. Acts of Conn., 1822; Stat. enacted Feb. 9, 1976, codified as Sec. 1, Ch. XCVII, Vol. 2, Laws of the State of Delaware, 1700-1797, at 1247; Act of Dec. 23, 1833, codified Digest of the Laws of Georgia, 1837, at 672; Act of Jan. 20, 1789, codified in Maryland Laws by Kilty, 1785-99, ch. LXXXIX; Mass. Rev. Stat.

In contrast with the states, the federal government raised revenue largely through tariffs and, to a lesser extent, excise taxes on commodities like alcohol. *Federal Taxation* at 21-22. Notably, Congress routinely exempted religious items from both of these forms of taxation. *See* 6 Stat. 116 (1813); 6 Stat. 600 (1834); 6 Stat. 162 (1816); 6 Stat. 675 (1836). We are not aware of any examples of federal taxation of clergy housing at the time of the Founding. Nor is that surprising, given that the federal government was constitutionally restricted in the direct taxes it could impose. *See* U.S. Const. art. I § 9, cl. 4.

The federal tax system changed dramatically with the passage of the Sixteenth Amendment and the creation of the nation's first permanent income tax in 1913. But one thing did not change: Ministers' church-provided housing remained exempt from taxation. Indeed, as soon as the IRS tried to tax ministers on the rental value of their parsonages, O.D. 862; 2 Cum Bull. 85 (1921), Congress responded by explicitly exempting them from the income tax. Revenue Act of 1921, Pub. L. No. 67-98, § 213(b)(11), 42 Stat. 227, 239. This is powerful evidence that Congress rejected Plaintiffs' interpretation of the Establishment Clause.

---

of 1835, Title III, sec. 5 at 75; Sec. 2, Title VII, N.H. Comp. Stat., 1853, at 113; Act of Apr. 11, 186, N.J. Sess. Laws of 1866, at 1078-1079; Act of 1 Apr., 1799, codified as Ch. 72, N.Y. Laws, 1797-1800, vol. 4, at 414; Sec. X, ch. III, Laws of N.C., 1806, codified in N.C. Rev. Laws, 1796-1820 (Potter, Taylor & Young); Sec. VIII, ch. 109, Penn. Stat. at Large, 1798-1801, passed Apr. 11, 1799, at 379; Act of Apr. 16, 1838, codified in Penn. Laws, 1700-1852, at 769; Act Regulating the Assessing and Collecting of Taxes, R.I. Pub. Laws, 1822, sec. 27, at 318; Stat. of Mar. 22, 1786, codified at S.C. Stat. at Large, 1752-1786, at 732; Act of Jan 23, 180, Va. Stat. at Large, Shepherd's Continuation of Henning, 1796-1803, at 200; An Act to lay and collect a direct tax, enacted by the City Council of Washington, Oct. 6, 1802, Bothwell's Compilation of Laws for Washington (1833), at 20.

6

By the 1950s, fewer ministers lived in church-owned parsonages, and more churches began providing ministers with a cash housing allowance. Facts ¶¶ 45-50. When those ministers sought an income tax exemption, the IRS initially resisted; but several federal courts rejected the IRS's position, concluding that an income tax exemption was required. *MacColl v. United States*, 91 F. Supp. 721, 722 (N.D. Ill. 1950); *Conning v. Busey*, 127 F. Supp. 958 (S.D. Ohio 1954) (following *MacColl*); *Williamson v. Comm'r*, 224 F.2d 377 (8th Cir. 1955). Congress then codified these decisions in § 107(2), expressly recognizing that to do otherwise would discriminate against smaller, newer, and poorer churches. Internal Revenue Code of 1954, § 107, 68A Stat. 1, at 32; H.R. Rep. No. 83-1337, at 4040 (1954); S. Rep. No. 83-1622, at 4646 (1954).

This is simply the latest example of our nation's longstanding history of exempting ministers' church-provided housing from taxation. Indeed, no matter the prevailing form of taxation—whether property taxes at the Founding or income taxes since 1913—and no matter the prevailing way for churches to house their ministers— whether church-owned parsonages historically or cash allowances more recently— ministers' housing has consistently been exempt. All three branches of government have recognized that this is not only permissible under the Establishment Clause but may in some cases be required. Plaintiffs offer not a single example to the contrary. Thus, this is an easy case: More than two centuries of "our history and uninterrupted practice" show that "federal or state grants of tax exemption to churches were not a violation of the Religion Clauses of the First Amendment." *Walz*, 397 U.S. at 680.

7

**B. The parsonage allowance is consistent with the controlling opinion in *Texas Monthly*.**

The parsonage allowance is also consistent with *Texas Monthly*. The controlling opinion in that fractured decision is the Blackmun/O'Connor concurrence. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *Freedom From Religion Inc. v. Lew*, 983 F. Supp. 2d 1051, 1061-62 (W.D. Wis. 2013), *vacated & remanded,* 773 F.3d 815 (7th Cir. 2014); *Catholic Health Initiatives Colo. v. City of Pueblo, Dep't of Fin.*, 207 P.3d 812, 828 (Colo. 2009) (Eid, J., dissenting). The concurrence offered a "narrow resolution of the case," focused on the unique nature of exemptions for religious *publications*. Justices Blackmun and O'Connor were concerned with the Texas law's "preferential support for the communication of religious messages." *Texas Monthly v. Bullock,* 489 U.S. 1, 28 (1989) (Blackmun, J., concurring). They acknowledged that the exemption would could satisfy the Establishment Clause if it were coupled with an exemption for "philosophical literature," or even if it could be read to apply to atheistic literature. *Id.* at 27-29. And they acknowledged that if Texas exempted some other literature from taxation, it could even be *required* to exempt religious literature under the Free Exercise Clause. *Id.* at 26, 28 (citing *Follett v. McCormick*, 321 U.S. 573 (1944), and *Murdock v. Pennsylvania*, 319 U.S. 105 (1943)).

Here, the parsonage allowance is unlike the tax exemption struck down in *Texas Monthly* in two critical ways. First, the parsonage allowance is coupled with *numerous* tax exemptions for nonreligious housing and housing allowances. *See infra* Part II.C; 26 U.S.C. §§ 119, 132, 162, 911, 912. Under such circumstances, the rationale of the concurrence may even *require* a tax exemption for ministers' housing. *See Texas*

*Monthly*, 489 U.S. at 26, 28 (Blackmun, J., concurring).[3]

Second, unlike an exemption for religious publications, the parsonage allowance is not tied to "spreading religious messages." Plaintiffs try to equate the minister's house with religious speech because Treasury Regulations limit the exclusion under § 107(2) to housing allowances received as compensation for services performed "in the exercise of [the] ministry." Pls' Br. at 16. But this argument misses the point of the *Texas Monthly* concurrence. The law in *Texas Monthly* favored the very communications themselves—the religious literature. For this reason, it implicated the Establishment Clause, the Free Exercise Clause, *and* the Press Clause. *Texas Monthly*, 489 U.S. at 28 (Blackmun, J., concurring). But the parsonage allowance is tied to property, and is limited to the actual expenditures for providing and maintaining that property. *See* 26 U.S. C. § 107(2). In that sense, because it is tied to property, the parsonage allowance is much more like the property-tax exemption upheld in *Walz*. It is the minister, not the minister's home or housing allowance, who performs the ministry. Furthermore, Plaintiffs' argument proves too much. If the parsonage allowance amounts to support for spreading "religious messages" simply because a minister may use his or her home in the ministry, then so does the exemption for church buildings in *Walz*, because church buildings are certainly used for religious worship.

---

[3] For this same reason, this case is unlike *In re Springmoor*, 498 S.E.2d 177 (N.C. 1998), where a bare majority of the North Carolina Supreme Court struck down a tax exemption that applied exclusively to religious and Masonic retirement homes. Furthermore, the *Springmoor* court misinterpreted *Walz*, *id.* at 188 (Lake, J., dissenting), and failed to analyze the *Texas Monthly* opinions as *Marks* requires.

9

Thus, Plaintiffs' interpretation of *Texas Monthly* would overrule *Walz*.

Because the parsonage allowance does not constitute "preferential support for the communication of religious messages," it satisfies the controlling opinion. *Texas Monthly*, 489 U.S. at 28 (Blackmun, J., concurring).

### C. The parsonage allowance is consistent with the *Texas Monthly* plurality.

The parsonage allowance also satisfies the more stringent test of the *Texas Monthly* plurality. Under that test, "[w]hat is crucial is that any subsidy afforded religious organizations be warranted by some *overarching secular purpose* that justifies like benefits for nonreligious groups." 489 U.S. at 14 n.4 (plurality) (emphasis added). Importantly, the fit between the overarching secular purpose and the benefit for religious organizations need not be perfect. Rather, it is enough if "it can be *fairly concluded* that religious institutions *could be thought* to fall within the natural perimeter [of the legislation]." *Id.* at 17 (emphasis added) (quoting *Walz,* 397 U. S. at 696 (Harlan, J., concurring)).[4]

Here, the "secular purpose" is the fair treatment of employee housing under the convenience of the employer doctrine. This doctrine has been codified in multiple pro-

---

[4] Plaintiffs' attempts to rewrite this standard are unavailing. *See, e.g.*, Pls.' Br. 13 (exemptions must be "neutrally available to other taxpayers"; *id.* at 18 ("The requirement of neutrality and general applicability"; "neutrally and generally available to a broad range of taxpayers"); *id.* at 23 ("generally available on the basis of neutral and non-religious criteria linked by an overarching conceptual and principled heritage"); *id.* at 40-41 ("neutral and generally available to other taxpayers on the basis of secular criteria").

visions throughout the tax code, and Congress has expressly stated that the parsonage allowance falls within it. Plaintiffs' arguments to the contrary cannot be squared with history, logic, or basic principles of tax law.

### 1. The parsonage allowance applies the convenience of the employer doctrine to ministers.

The convenience of the employer doctrine is as old as the federal income tax itself. It recognizes that when an employer provides housing primarily to further the employer's business, rather than to compensate the employee, the housing should not be treated as income. *Jones v. United States*, 60 Ct. Cl. 552, 575 (1925); *see generally* J. Patrick McDavitt, *Dissection of a Malignancy: The Convenience of the Employer Doctrine*, 44 Notre Dame Law. 1104 (1969).

Over time, Congress has codified this doctrine in several different provisions of the tax code. The general, catch-all provision is § 119(a)(2), which allows *any* employee to exclude the value of lodging from income if certain conditions are met. Treas. Reg. § 1.119-1(b). But Congress has also codified a variety of rules that relax the requirements of § 119(a)(2) for various types of employees. These include employees living in foreign camps (§ 119(c)), employees of educational institutions (§ 119(d)), members of the armed services (§ 134), government employees living overseas (§ 912), any citizen living abroad (§ 911), and any employee away from home on business for certain periods of time (§§ 162 & 132). The common thread among all of these employees is that they face significant, job-related demands on their housing.

In enacting § 107, Congress determined that ministers face similar demands on their housing. For example, ministers are often required to live at or near the church

11

to be close to those they serve. Facts ¶¶ 66, 74-79, 81-87, 97, 104-110, 119, 129, 131, 142-43, 146. They are required to be available to serve their flocks at any hour of the day or night. Facts ¶¶ 75-76, 84, 108-10, 139-41, 149, 157-58. They are required to use their homes to fulfill their duties and to serve the church. Facts ¶¶ 80, 115-18, 148-50, 152. And they can be required to move elsewhere according to the needs of their employer. Facts ¶¶ 42, 51, 102, 145. Because of these unique demands on their housing, ministers easily "could be thought to fall within the natural perimeter" of the convenience of the employer doctrine. *Texas Monthly*, 489 U.S. at 17 (emphasis added) (quoting *Walz,* 397 U. S. at 696 (Harlan, J., concurring). Because of this—and because of concerns about entanglement and non-discrimination—Congress extended the same treatment to them.

Plaintiffs offer a variety of responses—all unavailing. First, they claim that § 107(2) cannot be an application of the convenience of the employer doctrine because the requirements of § 107(2) are not identical to those of § 119(a)(2). But this conflates the convenience of the employer *doctrine* with a single statutory application of it in § 119(a)(2). Congress has codified the convenience of the employer doctrine in multiple sections of the tax code, many of which—just like § 107(2)—relax certain aspects of § 119(a)(2) for certain types of employees.

Next, Plaintiffs claim that some of these codifications are not actually examples of the convenience of the employer doctrine. For example, they argue that § 134 and § 912—which exempt cash housing allowances for any member or former member of the uniformed services and any government employee living abroad—are not about

12

the convenience of the employer doctrine, but are about "the government structuring [its] compensation, including fringe benefits, for its own employees." Pls.' Br. 22.

This argument has two fatal flaws. First, it ignores history. The convenience of the employer doctrine *originated* in the context of government employees, with the Commissioner of Revenue deciding in 1914 that when a government employee received quarters with more rooms than the law fixed as part of the employee's compensation, "it is assumed that excess number is assigned for the convenience of the Government," and would not be considered income. McDavitt, 44 Notre Dame Law. at 1105 (citing T.D. 2090, 16 Treas. Dec. Int. Rev. 259, 263 (1914); T.D. 2079, 16 Treas. Dec. Int. Rev. 249 (1914)). Later decisions likewise applied the convenience of the employer doctrine to the various "post allowances" and "cost-of-living" allowances that government employees received when they were stationed abroad. *Id.* at 1108 & n.40 (collecting decisions). Similarly, the first court decision applying the convenience of the employer doctrine arose in the military context, with the Court reasoning that the provision of military quarters (or cash in lieu of quarters) is premised "upon the assumption . . . that such quarters are necessary to the discharge of [a soldier's] duty." *Jones*, 60 Ct. Cl. at 570 (quoting *United States v. Phisterer*, 94 U.S. 219, 224 (1876)). Thus, when Congress enacted §§ 134 and 912 in 1954, it was simply codifying pre-existing applications of the convenience of the employer doctrine.

Second, Plaintiffs' argument is illogical. If §§ 134 and 912 are only about the terms of government employment rather than the convenience of the employer doctrine, then why are they limited to members of the military and government workers

13

abroad? Why not give tax-free housing allowances to *all* government workers? Neither the Plaintiffs nor the authors they cite offer an answer. The reason is simple: Sections 134 and 912 are codifications of the convenience of the employer doctrine, driven by the unique housing demands related to military service and employment abroad.

Plaintiffs' attempts to distinguish other codifications of the convenience of the employer doctrine are equally meritless. Section 912(a)(2), for example, allows any "citizen or resident of the United States" residing in a foreign country to exclude housing costs above a certain level. This is because, if an individual is working abroad, she likely has significant extra housing costs that reduce her real income compared with a domestic worker. Plaintiffs cite sources suggesting that these provisions are not about the convenience of the employer doctrine but are instead about protecting Americans living overseas from double taxation. Pls.' Br. 22-23 (citing Adam Chodorow, *The Parsonage Exemption* 101 (2017), Ex. 2 to Decl. of Richard Bolton, ECF No. 61-2). But these sources mistakenly rely on the legislative history of an *earlier version of § 911* that applied only to "foreign earned income"—not housing costs. *See* Chodorow at 135-37. Even Plaintiffs' own source is forced to concede that the addition of the *housing exclusion* to § 911 in 1981 was designed to ease the burden of living abroad. *Id.* at 137 (citing S. Rep. 97-134, at 36 (1981); H.R. Rep. 97-201, at 10-11 (1981)). In other words, it *is* a codification of the convenience of the employer doctrine.

Plaintiffs do not even attempt to distinguish the other examples of the convenience of the employer doctrine in the tax code: § 119(c), which exempts "lodging in a camp

located in a foreign country"; § 119(d), which exempts "qualified campus lodging" of the employees of educational institutions; and §§ 162 and 132, which allow anyone posted away from their normal workplace for one year or less to receive tax free housing allowances or in-kind lodging from their employer. None of these codifications of the doctrine require the individual employee to meet the five-part test in § 119(a)(2). Instead, they reflect Congress's judgment that the type of work, the burdens on housing, or a non-commercial working relationship make it *likely* that employer-provided lodging is intended to benefit the employer. In other words, these categories of employees "could be thought to fall within the natural perimeter" of the doctrine. *Texas Monthly*, 489 U.S. at 17.

So too with ministers and § 107. Like the other categories of employees, ministers face unique, job-related demands on their housing—including requirements to live near the church, be available day and night, use their homes to serve the church community, and move elsewhere according to the needs of their employer. Facts ¶¶ 42, 51, 74-79, 80-87, 102, 104-10, 115-19, 129, 131, 139-52, 157-58. Thus, they easily fall within the convenience of the employer doctrine.

The available historical evidence further confirms that the parsonage allowance is in fact a legislative application of the convenience of the employer doctrine. In 1921, the Bureau of Revenue (the predecessor to the IRS) issued a series of decisions applying the convenience of the employer doctrine to a variety of employees—including "employees engaged in fishing and canning," O.D. 814, 2 Cum. Bull. 84-85 (1921),

employees of the "Indian Service," O.D. 914, 2 Cum. Bull. 85 (1921), hospital employees, O.D. 915, 2 Cum. Bull. 85-86 (1921), and members of the military, O.D. 921, 2 Cum. Bull. 86 (1921). Importantly, as part of those decisions, the Bureau determined that clergy who were "permitted to use the parsonage for living quarters free of charge" did not fall within the convenience of the employer doctrine. O.D. 862, 2 Cum. Bull. 85 (1921).

Congress immediately responded, overruling the Bureau's decision later that year by expressly excluding from gross income "the rental value of a dwelling house and appurtenances thereof furnished to a minister of the gospel as part of his compensation." Revenue Act of 1921, Pub. L. No. 67-98, § 213(b)(11), 42 Stat. 227, 239. This provision was offered without explanation, was not discussed in committee hearings or reports, was accepted without debate on the Senate floor, and was accepted by the House without recorded discussion. 61 Cong. Rec. S7162 (Nov. 2, 1921) (amendment of Mr. Dial); H.R. Rep. 67-486, at 23 (1921). From this, Plaintiffs suggest that the statute was not really about the convenience of the employer doctrine. Pls.' Br. 27. But Congress did not need to state the obvious. The Bureau had just ruled that clergy did not fall within the convenience of the employer doctrine, and Congress was directly overruling that decision. Thus, the statute obviously reflects Congress's judgment that ministers living in parsonages "could be thought to fall within the natural perimeter" of the convenience of the employer doctrine.

Congress again recognized the relationship between ministers' homes and their

16

work when it added § 107(2) in 1954. Congress added § 107(2) to "remove[] the discrimination in existing law" by affording the same tax treatment to ministers' homes whether their churches provided them in-kind or through a cash housing allowance. H.R. Rep. No. 83-1337, at 4040 (1954); S. Rep. No. 83-1622, at 4646 (1954). Under the new law, housing allowances were excluded from ministers' income only "to the extent used by them to rent or provide a home." H.R. Rep. No. 83-1337, at 4040. And a "home" was understood to be limited to the "dwelling house and appurtenances thereof"—it did not include a farm or other "business property." *Id.* at A35. In adding these limitations, Congress recognized the connection between a minister's "dwelling" and the exigencies of pastoral service: ministers' dwellings facilitate their work, while business property would simply provide them a way to earn additional revenue. Thus, Congress excluded only the former from a minister's income—the portion that "could be thought to fall within the natural perimeter" of the convenience of the employer doctrine. *Texas Monthly*, 489 U.S. at 17.

This interpretation is confirmed by the most recent amendment to the parsonage allowance. In 2002, Congress amended § 107(2) to limit the exclusion of cash housing allowances to the fair rental value of the minister's home and furnishings plus the cost of utilities. Clergy Housing Allowance Clarification Act of 2002, P.L. 107-181 (2002). The initial version of the bill included a statement of Congressional purpose and findings recognizing that § 107 applies the convenience of the employer doctrine to ministers in a way that respects church autonomy, avoids discrimination, and reduces government entanglement with religion. *See* H.R. 4156, 107th Cong., 2d. Sess.

17

(as introduced Apr. 10, 2002). The findings stated that ministers may need to "locate to specific communities for such periods of time as designated by their denomination," and that they "frequently are required to use their homes for purposes that would otherwise qualify for favourable tax treatment, but which may require more intrusive inquiries by the government into the relationship between clergy and their respective churches with respect to activities that are inherently religious." *Id*. This preamble was later removed, but only because the House Committee on Ways and Means traditionally does not include statements of purpose in tax legislation. 148 Cong. Rec. H1299, H1300, Apr. 16, 2002 (statement of Mr. Ramstad).

Nevertheless, the Republican and Democratic co-sponsors continued to make clear that § 107 stems from the convenience of the employer doctrine. *Id*. at H1299 (statement of Mr. Ramstad) ("This allowance is similar to other housing provisions in the Tax Code offered to workers who relocate in a particular area for the convenience of their employers, and military personnel who receive a tax exclusion for their housing."); *id*. at H1300 (statement of Mr. Pomeroy) ("The housing exclusion benefits clergy of all faiths, recognizing that a clergy person's home is not just a shelter, but an essential meeting place for members of the congregation, and also, in light of the unique relationship between a pastor or a clergy member and the congregation, the distinct housing component of it is a unique feature of that relationship."). The bill passed both the House and Senate unanimously. 148 Cong. Rec. H1306 (Apr. 16, 2002); 148 Cong. Rec. S3887 (May 2, 2002).

In sum, ministers easily fall within the natural perimeter of the convenience of

the employer doctrine. And that is precisely why Congress enacted § 107.

### 2. The parsonage allowance reduces entanglement.

The parsonage allowance is not merely a reasonable application of the convenience of the employer doctrine. It is also a *necessary* measure to reduce entanglement between church and state and to eliminate discrimination among religions.

Plaintiffs' basic argument is that ministers should not be treated like members of the military, employees of educational institutions, or overseas workers, all of whom qualify for the convenience of the employer doctrine under specific statutory provisions; instead, they should be subject to the default "convenience of the employer" provision under § 119(a)(2). Pls.' Br. 39, 18. But as we have explained (Br. 41-43), applying § 119(a)(2) to ministers creates severe entanglement problems.

First, it requires the government to determine whether a minister is an "employee," Treas. Reg. § 1.119-1(b), which requires an intrusive inquiry into the nature of the relationship between the minister and the church. Although some relationships between a minister and a church may look like "employment," others look more like self-employment or volunteerism, depending on the nature of the church polity. Br. 41. Thus, applying § 119(a)(2) to ministers would not only require an intrusive inquiry, it would also result in differential tax treatment depending on the nature of the church polity. *Id.* (citing decisions suggesting that United Methodist Council ministers would qualify as "employees," but Pentecostal ministers would not). Precisely to avoid this result, other tax provisions uniformly treat all ministers as being self-employed. *See* 26 U.S.C. §§ 1402(c)(4), 1402(e), 3121(b)(8).

Professor Chodorow suggests that churches could avoid this issue by "explicitly

19

hir[ing] their ministers." Chodorow at 141. But many churches have profound theological objections to "explicitly hir[ing] their ministers" because of the way it affects the minister's autonomy. Perhaps recognizing that, Chodorow suggests that the IRS could simply "deem them to be employees for purposes of Section 119." *Id.* But that is precisely why Congress enacted § 107: It needed a means of applying the convenience of the employer doctrine to ministers that doesn't create the entanglement problems of § 119.

Second, § 119(a)(2) would require the government to decide whether the ministers' lodging is necessary "to enable him properly to perform the duties of his employment." Treas. Reg. § 1.119-1(b). In other words, the IRS would have to decide whether "properly . . . perform[ing]" the duties of a minister means that a minister must live near his congregation, must respond to spiritual emergencies at all hours of the night, must use his home to host church meetings or prepare sermons, or must move elsewhere as the church requires. Indeed, Congress heard testimony on precisely this issue when it was considering § 107(2) in 1954: A rabbi testified that he used his home for ministry in multiple ways—such as for hosting the congregation on holy days, conducting board meetings, and preparing sermons—but the Bureau determined that these uses were "not necessary" for his ministry. General Revenue Revision, Hearings Before the Committee on Ways & Means, House of Representatives, 83d Cong., 1st Sess., pt. 1 (June 16-July 21, 1953), at 223, 224. Such determinations raise serious entanglement problems. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 565 U.S. 171, 206 (2012) (Alito, J., concurring) (courts cannot assess

"the importance and priority of the religious doctrine in question," what a "church really believes," or "how important that belief is to the church's overall mission"). But Plaintiffs offer no response.

Instead, Plaintiffs argue that § 107 is just as entangling, because it requires the IRS to determine who is a "minister." Pls.' Br. 35-39. But Plaintiffs grossly exaggerate the difficulty of this inquiry. Indeed, the tax code routinely requires the IRS to determine who is a "minister." For example, churches are not required to withhold federal income taxes from "minister[s]." 26 U.S.C. § 3401(a)(9). Churches are exempt from Social Security and Medicare taxes for wages paid to "minister[s]." 26 U.S.C. §§ 1402(c)(4), 1402(e), 3121(b)(8). Churches can include "ministers" in 403(b) contracts (a type of tax-deferred benefit) even if the ministers do not qualify as employees. 26 U.S.C. § 403(b)(1)(A)(iii). And "ministers" who object to public insurance programs are exempt from Social Security and Medicare altogether. *See* 26 U.S.C. § 1402(e).

All of these statutes rely on the same definition of "minister" as § 107. *See* Treas. Reg. §§ 31.3121(b)(8)-1, 1.1402(c)-5. In fact, the regulations interpreting the definition of a "minister of the gospel" under § 107 simply cite to the regulations for the Social Security exemption. *See* Treas. Reg. § 1.107-1(a) (citing Treas. Reg. § 1.1402(c)-5). Plaintiffs have admitted that several of these other statutes serve laudable First Amendment goals like "protect[ing] the relationship between churches and ministers," Pls.' Response to Intervenors' Stmt. of Proposed Findings of Fact, ECF No. 64, ¶ 61; "modify[ing] tax provisions so that they apply neutrally among various church

21

polities," *id*. ¶ 64; and "mak[ing] sure that general tax rules do not discriminate among ministers based on the nature of their relationship with the church," *id*. ¶ 65. If the IRS can determine who qualifies as a minister under those statutes, then it can do the same under § 107. And once the IRS has determined that a taxpayer is a "minister" under one statute, simply applying the same result to another statute—like § 107—requires no additional inquiry that could cause entanglement.

Furthermore, it is illogical to argue that deciding who is a "minister" under § 107 violates the First Amendment when the same Amendment *requires* the government to determine who is a "minister" for purposes of the ministerial exception. *See Hosanna-Tabor*, 565 U.S. at 188 (First Amendment forbids applying employment discrimination laws to "claims concerning the employment relationship between a religious institution and its ministers"). The factors that the Supreme Court analyzed in *Hosanna-Tabor* are functionally indistinguishable from the factors that the IRS considers when administering § 107 and the other statutes mentioned above. The majority considered that the employee was a "commissioned" minister. Compare *id*. at 190-91, *with* Treas. Reg. § 1.1402(c)-5(a)(2) ("duly ordained, commissioned, or licensed minister of a church"). And it considered her role in teaching the church's doctrine and leading acts of worship like prayer and chapel services. *Compare Hosanna-Tabor*, 565 U.S. at 192, *with* Treas. Reg. § 1.1402(c)-5(b)(2) (duties of a minister include "the performance of sacerdotal functions" and "the conduct of religious worship"). The Court in *Hosanna-Tabor* even recognized the connection between § 107 and the min-

22

isterial exception, finding it significant to the constitutional analysis that the employee held herself out as a minister, in part by utilizing § 107. *Hosanna-Tabor*, 568 U.S. at 191-92. If these inquiries are required by the First Amendment on the one hand, they cannot be prohibited by the First Amendment on the other.

### 3.  The parsonage allowance avoids discrimination among religions.

Section 107(2) also eliminates discrimination among religions. As we have explained (Br. 44-45), newer and poorer churches often cannot afford to purchase a parsonage and provide it to their minister. Other churches have theological reasons for not acquiring physical parsonages. *Id.* Thus, if the parsonage allowance were available only to churches that could purchase physical parsonages (§ 107(1))—and not to those that provide a cash housing allowance (§ 107(2))—the result would be discrimination between "well-established churches" and "churches which are new and lacking in constituency." *Larson v. Valente,* 456 U.S. 228, 246 n.23 (1982). This sort of discrimination violates "[t]he clearest command of the Establishment Clause." *Id.* at 244, 246.

Plaintiffs concede that § 107(1), standing alone, "may impact religious taxpayers differently." Pls.' Br. 30. They simply claim that treating religious taxpayers differently is permissible so long as it is not "deliberate." *Id.* But the same argument was made and rejected in *Larson.* There, the state argued that its fifty-percent rule was "facially neutral," "based upon secular criteria," and not motivated by any intent to discriminate. 456 U.S. at 246 n.23. But the Supreme Court still struck down the law, because it had the effect of treating "well-established churches" better than new ones. *Id.* at 272; *see also Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) (First Amendment

23

prohibits not just intentional discrimination among religions, but also "indirect way[s] of preferring one religion over another"). Indeed, eliminating § 107(2) would be even more troubling than the law in *Larson*, because § 107(1) "facially regulate[s] religious issues." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) (McConnell, J.) (internal quotations marks omitted). In that context, there is an even higher burden to "treat individual religions and religious institutions without discrimination or preference." *Id.* (quotation omitted).

Unable to dispute that § 107(2) reduces discrimination, Plaintiffs resort to claiming that this was not the *real* reason for enacting § 107(2). Instead, quoting a small portion of one statement from Congressman Peter Mack, they argue that the real reason was "to broadcast a message of support for religion during the Cold War." Pls.' Br. 28. But Plaintiffs have distorted Congressman Mack's comments by truncating them and taking them out of context. In fact, he explained that representatives from numerous denominations brought it to his attention that the existing law discriminated against churches that could not provide a parsonage in-kind. General Revenue Revision, Hearings Before the Committee on Ways and Means, House of Representatives, 83rd Cong., 1st Sess., pt. 3 (Aug. 6-14, 1953), at 1574-75. And he expressly called on Congress to add § 107(2) to "correct this discrimination against certain ministers of the gospel." *Id.* at 1576.

Beyond that, Plaintiffs ignore the fact that, shortly before Congress enacted § 107(2), several federal courts held that cash allowances must be excluded from the income of ministers. *MacColl v. United States*, 91 F. Supp. 721, 722 (N.D. Ill. 1950);

24

*Conning v. Busey*, 127 F. Supp. 958 (S.D. Ohio 1954) (following *MacColl*); *Williamson v. Comm'r*, 224 F.2d 377 (8th Cir. 1955). Section 107(2) simply codifies these decisions, and the House and Senate committees both agreed that the statute would "remove[] the discrimination in existing law" among various denominations. H.R. Rep. No. 83-1337, at 4040 (1954); S. Rep. No. 83-1622, at 4646 (1954). In short, the evidence overwhelmingly establishes that the purpose of § 107(2) was to eliminate discrimination—and that is precisely what it does.[5]

## CONCLUSION

The Court should grant Intervenors' motion for summary judgment.

---

[5] Plaintiffs fail to respond to Intervenors' argument that the Due Process claim adds nothing to Plaintiffs' Establishment Clause claim. *See* Br. at 48. Plaintiffs have therefore conceded that Intervenors are entitled to summary judgment on the Due Process claim.

Dated: April 24, 2017                    Respectfully submitted,


                                         /s/ Hannah C. Smith_____
                                         Hannah C. Smith
                                         Luke W. Goodrich
                                         Daniel D. Benson*
                                         The Becket Fund for Religious Liberty
                                         1200 New Hampshire Ave. NW, Suite 700
                                         Washington, DC 20036
                                         Email: hsmith@becketfund.org
                                         Telephone: (202) 955-0095
                                         Facsimile: (202) 955-0090

                                         *Counsel for Intervenor-Defendants*

                                         **Admitted in Utah and the Western District of
                                         Wisconsin, but not in D.C. Supervised by Ms.
                                         Smith and Mr. Goodrich, members of the D.C.
                                         Bar.*