IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANNIE LAURIE GAYLOR; DAN BARKER;
IAN GAYLOR, personal representative of
the estate of Anne Nicol Gaylor; and
FREEDOM FROM RELIGION FOUNDATION, INC.,

              OPINION AND ORDER

       Plaintiffs,

              16-cv-215-bbc

    v.

STEVE MNUCHIN, Secretary of the United States
Department of Treasury; JOHN KOSKINEN,
Commissioner of the Internal Revenue Service;
and the UNITED STATES OF AMERICA,

       Defendants,[1]

   and

EDWARD PEECHER; CHICAGO EMBASSY CHURCH;
PATRICK MALONE; HOLY CROSS ANGLICAN CHURCH;
and the DIOCESE OF CHICAGO AND MID-AMERICA OF THE
RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA,

       Intervenor-Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

    The question in this case is whether Congress may give a subset of religious employees

an income tax exemption for which no one else qualifies. At issue is the constitutionality of

26 U.S.C. § 107(2), which excludes from the gross income of a "minister of the gospel" a

---

[1] In accordance with Fed. R. Civ. P. 25(d), I have substituted the current Secretary
of the Department of Treasury for Jacob Lew.

1

"rental allowance paid to him as part of his compensation." (Although the phrase "minister of the gospel" appears on its face to be limited to Christian ministers, the Internal Revenue Service has interpreted the phrase liberally to encompass certain religious leaders of other faiths as well. E.g., Silverman v. Commissioner, 57 T.C. 727, 731 (1972) (applying "minister of the gospel" to persons holding equivalent status in other religions); Rev. Rul. 78-301, 178-2 C.B. 103 (applying "minister of the gospel" to those who perform "substantially all of the religious functions" of ordained minister). The correctness of the IRS's interpretation of § 107 is not at issue.)

Plaintiff Freedom from Religion Foundation, Inc. and some of its officers brought this lawsuit to challenge § 107(2) on the ground that it discriminates against secular employees and violates both the establishment clause of the First Amendment and the equal protection component of the Fifth Amendment. Plaintiffs initially challenged § 107(1), which excludes from a minister's gross income "the rental value of a home furnished to [the minister] as part of his compensation," but I dismissed that part of the lawsuit for lack of standing. Dkt. #15.

This is the second time that the foundation and its officers have challenged § 107(2). In Freedom from Religion Foundation, Inc. v. Lew, 983 F. Supp. 2d 1051 (W.D. Wis. 2013), I concluded that the provision violates the establishment clause because it provides a benefit to religious persons and no one else, even though doing so is not necessary to alleviate a special burden on religious exercise. On appeal, the Court of Appeals for the Seventh Circuit did not reach the merits of plaintiffs' claims but instead vacated the judgment on the ground that plaintiffs did not have standing to sue. Freedom from Religion Foundation, Inc. v. Lew, 773 F.3d 815 (7th Cir. 2014).

Now plaintiffs say that they followed the directions of the court of appeals to obtain standing and are challenging § 107(2) again. In a previous opinion in this case, the court allowed three ministers who receive housing allowances, along with the churches the ministers serve, to intervene under Fed. R. Civ. P. 24 to present their own view regarding why they believe § 107(2) is valid. Dkt. #35.

The case is now before the court on three motions: (1) Christopher Butler's unopposed motion to intervene as a defendant, dkt. #81; (2) a motion for summary judgment filed by the United States of America, the Commissioner of the Internal Revenue Service and the Secretary of the United States Department of Treasury, dkt. #43; and (3) a motion for summary judgment filed by the intervenor defendants, dkt. #48. Plaintiffs have not filed their own summary judgment motion, but instead ask the court in their opposition brief to enter judgment in their favor on the court's own motion. Dkt. #65 at 41. See also Ellis v. DHL Exp. Inc. (USA), 633 F.3d 522, 529 (7th Cir. 2011) ("District courts have the authority to enter summary judgment sua sponte as long as the losing party was on notice that it had to come forward with all its evidence."). None of the defendants object to this request on procedural grounds.

The motion to intervene will be granted. Butler is the new pastor of intervenor defendant Chicago Embassy Church, replacing intervenor defendant Edward Peecher, who no longer works for that church. Like Peecher, Butler receives a housing allowance. Butler's interests are identical to Peecher's, Butler is adopting the summary judgment materials filed by intervenor defendants and he is not asking to make any changes to the case. In these circumstances, it is appropriate to allow him to intervene. Intervenor defendants have not

moved to dismiss Peecher, presumably because he now works for a different church and will continue to receive a housing allowance and claim an exemption under § 107(2). Dkt. #83, ¶ 5.

As to the merits, I will deny defendants' motions for summary judgment and grant summary judgment in plaintiffs' favor. I adhere to my earlier conclusion in <u>Lew</u> that § 107(2) violates the establishment clause because it does not have a secular purpose or effect and because a reasonable observer would view the statute as an endorsement of religion.

Although defendants try to characterize § 107(2) as an effort by Congress to treat ministers fairly and avoid religious entanglement, the plain language of the statute, its legislative history and its operation in practice all demonstrate a preference for ministers over secular employees. Ministers receive a unique benefit under § 107(2); it is not, as defendants suggest, part of a larger effort by Congress to provide assistance to employees with special housing needs. A desire to alleviate financial hardship on taxpayers is a legitimate purpose, but it is not a secular purpose when Congress eliminates the burden for a group made up of solely religious employees but maintains it for nearly everyone else.

Under my view of the current law, that type of discriminatory treatment violates the establishment clause. This conclusion makes it unnecessary to consider plaintiffs' alternative argument that § 107(2) violates the equal protection component of the Fifth Amendment.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

A. <u>Plaintiffs</u>

Plaintiffs Annie Laurie Gaylor and Dan Barker are co-presidents of the Freedom from Religion Foundation, a nonprofit membership organization that advocates for the separation of church and state. Before her death in 2015, Anne Nicol Gayor was a lifetime member and president emerita of the foundation. (I will refer to Annie Laurie Gaylor simply as "Gaylor" and to Anne Nicol Gaylor by her full name.)

Gaylor and Barker each receive a salary from the foundation. Since 2011, the foundation has designated part of those salaries as a housing allowance. Anne Nicol Gaylor also received housing allowances before she died. The allowance for Gaylor and Barker was $4500 in 2011; $13,200 in 2012; and $15,000 in 2013. (Plaintiffs do not say what the allowance was in subsequent years, except that it is "intended to approximate their actual housing expenses for each year." Plts.' PFOF ¶ 8, dkt. #63.)

Gaylor and Barker pay federal income taxes, as did Anne Nicol Gaylor until her death. In January 2015, Gaylor and Barker filed an amended income tax return for the year 2013. (Plaintiffs do not say so expressly, but presumably Gaylor and Barker filed a joint return because they are married.) In their amended return, Gaylor and Barker claimed the designated housing allowance as an exclusion of income and they sought a partial refund of the taxes they paid. Anne Nicol Gaylor also filed an amended return for the tax year 2013 in which she sought the same refund.

On March 2, 2015, the Internal Revenue Service allowed Gaylor's and Barker's requested refund, but did not explain why. Dkt. #60-2. On April 13, 2015, the IRS

informed Anne Nicol Gaylor that it was processing her amended return, but it never issued a decision on her request for a refund.

In March 2015, Gaylor and Barker filed an amended return for the year 2012. They stated that they are "not clergy" and that their "employer is not a church," but they believed "it is unfair that ministers can exclude housing while we cannot." In July 2015, the IRS disallowed the claim. The letter stated that "individual taxpayer[s] are allowed to claim deductions for Housing on Sch A if they have mortgage interest and property taxes, otherwise there is no deduction." Dkt. #60-4. In a response to the IRS, Gaylor and Barker cited 26 U.S.C. § 107(2). In letters dated August 20, 2015, November 25, 2015 and January 12, 2016, the IRS informed Gaylor and Barker that the agency was "working on" their amended return. Dkt. #60-5; Plts.' PFOF ¶ 19, dkt. #63.

In April 2016, plaintiffs filed this lawsuit. On June 27, 2016, plaintiff received the following response from the IRS:

> My review of the information previously submitted by you indicates your claim should be denied. Your claim appears to be based on a portion of your wages being deemed to be a housing allowance. Your letter dated 07/14/2015 states that you are aware that a housing allowance is excludable from income if you are a minister of the gospel and also avows that neither of you are ministers of the gospel. It goes on to state that this is unfair and discriminatory. It appears that your concerns are misdirected. Congress writes tax laws and it is the job of the Internal Revenue Service to implement them. In other words, Congress set the rules and the IRS has to explain how those rules are applied in different situations. IRC Section 107 specifically requires that to exclude a housing allowance from income you must be a minister of the gospel. The IRS does not have the authority to interpret this to include anyone other than those who meet this definition.

Since receiving that response, plaintiffs Gaylor and Barker have filed amended returns for tax years 2014 and 2015 in which they seek a refund of taxes paid on their designated

housing allowances. They intend to continue seeking the exemption for as long as they receive a housing allowance.

## B. Intervenor Defendants

Intervenor defendant Patrick W. Malone is the rector of intervenor defendant Holy Cross Anglican Church in Waukesha, Wisconsin. He lives nine blocks from the church. The church pays Malone a housing allowance, which he excludes from his gross income when he files his taxes.

Malone may be required to perform services related to his ministry at any time of the day or night. Many church meetings and social events take place in his home. He provides temporary lodging to church members and others connected to the church.

Intervenor defendant Gregory Joyce is the rector of St. Vladimir Orthodox Church, which gives Joyce a housing allowance. The church is in Chicago, Illinois and is part of intervenor defendant Diocese of Chicago and Mid-America of the Russian Orthodox Church Outside of Russia. The diocese requires its priests to live within their parish. Clergy may use their homes to provide temporary lodging for church members and others connected to the church. Some priests may conduct services in their own homes when a parish is new and does not yet have a church building. Joyce has an office in his home that he uses for church business; he counsels church members in his home and hosts parish events there, sometimes with little notice and at any hour of the day or night.

Intervenor defendant Christopher Butler is the pastor of intervenor defendant Chicago Embassy Church, which pays Butler a housing allowance. The church is a member

of the Illinois District Council of the Assemblies of God USA.

OPINION

A. Standing

One of the jurisdictional prerequisites to filing a lawsuit in federal court is "standing," which means that the plaintiffs must suffer an "injury in fact" that is "fairly traceable" to defendants' conduct and capable of being redressed by a favorable decision from the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). In Freedom from Religion Foundation, Inc. v. Lew, 773 F.3d 815 (7th Cir. 2014), the court concluded that plaintiffs had not suffered an injury from § 107(2) because they had not "personally claimed and been denied the exemption." Id. at 821. Now it is undisputed that plaintiffs Gaylor and Barker asked for the exemption and that the IRS denied the request.

In light of the IRS's denial, the government is satisfied that plaintiffs now have standing to sue. Govt.'s Supp. Br., dkt. #75 at 7. In particular, the government does not deny that the IRS's rejection qualifies as an injury in fact; the injury is fairly traceable to § 107(2); and the injury could be redressed if plaintiffs prevail on their claim, either by granting them a refund or invalidating § 107(2). Heckler v. Mathews, 465 U.S. 728, 740 (1984) ("We have often recognized that the victims of a discriminatory government program may be remedied by an end to preferential treatment for others.").

Despite the government's position, two questions related to standing remain, one raised by the court and one raised by intervening defendants. First, as noted in an order dated June 19, 2017, dkt. #72, the IRS did not send Gaylor and Barker a rejection letter

until *after* they filed this lawsuit. Because standing is part of subject matter jurisdiction and subject matter jurisdiction must be present when a plaintiff files the lawsuit in federal court, State Farm Life Insurance Co. v. Jonas, 775 F.3d 867, 870 (7th Cir. 2014); Autotech Technologies LP v. Integral Research & Development Corp., 499 F.3d 737, 742–43 (7th Cir. 2007), this raised the question whether plaintiffs brought the case too soon. I asked the parties to file supplemental materials on this issue. Second, intervenor defendants contend that plaintiffs lack standing to seek an injunction or declaration because they "have produced no evidence suggesting that they will again be denied a refund in the future." Dkt. #53 at 5.

A review of the summary judgment materials and supplemental briefs shows that both questions should be resolved in plaintiffs' favor. First, in response to the court's June 19 order, plaintiffs cite 26 U.S.C. § 6532(a)(1), which permits the filing of a federal lawsuit to challenge a decision denying a refund after "the Secretary renders a decision" *or* "the expiration of 6 months from the date of filing the claim." In this case, plaintiffs waited more than a year before filing a federal lawsuit.

A party does not necessarily have standing to sue simply because a statute says she does. Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir. 2014). This is because Congress "may not lower the threshold for standing below the minimum requirements imposed by the Constitution." Id. (internal quotations omitted). However, Congress does have the power to "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." Id.

Although § 6532(a)(1) does not say so expressly, it is reasonable to construe the

provision to mean that a claim is effectively denied if the IRS does not render a decision within six months. All parties agree on this point. Because denial of the claim is the injury that confers standing, I conclude that a claimant has standing to sue once the six months have passed without a decision from the IRS. Lew, 773 F.3d at 821 n.3 (to obtain standing, plaintiffs could have "paid income tax on their housing allowance, claimed refunds from the IRS, and then sued if the IRS rejected *or failed to act upon their claims*") (emphasis added). Any other conclusion would allow the IRS to deprive a party of standing indefinitely by withholding a decision. Of course, if the agency later issued a decision in the claimant's favor, that decision could moot any pending lawsuit. However, because the IRS ultimately denied Barker's and Gaylor's claim, I need not consider that issue in this case.

Second, as to the intervenor defendants' argument that plaintiffs have not shown that future harm is likely, it is true that a party seeking prospective relief generally must show a "significant" or "substantial" risk that she will be harmed again in the future. Hummel v. St. Joseph County Board of Commissioners, 817 F.3d 1010, 1019-20 (7th Cir. 2016); Sierakowski v. Ryan, 223 F.3d 440, 443 (7th Cir. 2000). But it is simply not true that plaintiffs have adduced "no evidence" of future harm.

Intervenor defendants point out that the IRS actually granted Gaylor's and Barker's first request for a refund for the taxes they paid on their housing allowance. The agency did not explain its decision, but if that had been the only agency action on the question, I would agree with intervenor defendants that Gaylor and Barker do not have standing to obtain prospective relief.

The obvious flaw in intevenor defendants' argument is that the IRS denied Gaylor's

and Barker's later refund request. Although the opposing rulings may raise some doubt about future decisions, absolute certainty is not required. In re C.P. Hall Co., 750 F.3d 659, 660-61 (7th Cir. 2014) ("[O]ften a probabilistic harm suffices for Article III standing even when the probability that the harm will actually occur is small."); MainStreet Organization of Realtors v. Calumet City, Illinois, 505 F.3d 742, 744 (7th Cir. 2007) ("[S]tanding in the Article III sense does not require a certainty or even a very high probability that the plaintiff is complaining about a real injury, suffered or threatened.").

For two reasons, the decision denying Gaylor's and Barker's request for a refund is the more reliable indicator of the way that the IRS will handle future requests. First, it is the more recent decision. Second, it is the only decision in which the IRS explained its reasoning. In particular, the agency stated that the law "specifically requires that to exclude a housing allowance from income you must be a minister of the gospel. The IRS does not have the authority to interpret this to include anyone other than those who meet this definition." Dkt. #60-6. Thus, the agency has stated its position that Gaylor and Barker are not entitled to the exemption because they are not "ministers of the gospel." Because none of the parties have pointed to any changes in Gaylor's and Barker's behavior or status that would allow them to qualify for the exemption in the future, I see no reason why they would obtain a different result for future requests.

The intervenor defendants resist this conclusion on two grounds. First, they say that the court should not consider the IRS's rejection letter because Gaylor and Barker did not receive it until after they filed this lawsuit. Second, they say that, even if the letter may be considered, it is not informative because it relies on Gaylor's and Barker's own "avow[al]

that neither of [them] are ministers of the gospel" rather than an independent determination by the agency.

Neither argument is persuasive. As to the timing of the letter, intervenor defendants rely on the principle noted above that jurisdiction is decided at the time the complaint is filed, but they are conflating issues. Although a plaintiff must have standing to sue at the time she files her lawsuit, intervenor defendants cite no authority for the view that all the *evidence* showing that standing existed for a particular form of relief must also exist at that time. As noted above, it was the IRS's denial of the refund request that gave Gaylor and Barker standing to sue. It was not the rejection letter, which was simply evidence that the IRS would reject a similar request in the future.

With respect to the argument that the IRS's letter is not a good indicator of the agency's future rulings, it is true that the letter notes Gaylor's and Barker's "avowal" that they are not ministers of the gospel in the context of explaining the decision to deny a refund. However, regardless whether the IRS conducted its own inquiry into Gaylor's and Barker's qualifications for the exemption, the letter simply reflects what is obvious. As I noted in the earlier lawsuit, "there is no reasonable interpretation of the statute under which the phrase 'minister of the gospel' could be construed to include employees of an organization whose purpose is to keep religion out of the public square." Freedom from Religion Foundation v. Lew, 11-cv-626-bbc (W.D. Wis. Aug. 29, 2012), dkt. #30 at 9. Even the government acknowledges in its reply brief that the refunds that Barker and Gaylor received for 2013 "were issued erroneously." Dkt. #67 at 2. Accordingly, I conclude that plaintiffs Gaylor and Barker have standing to seek declaratory and injunctive relief.

Because Gaylor and Barker have standing, so does the foundation, under the doctrine of organizational standing. Sierra Club v. Franklin Cty. Power of Illinois, LLC, 546 F.3d 918, 924 (7th Cir. 2008) ("An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit."). None of the defendants argue that the foundation does not have standing if any of the individual plaintiffs do.

The death of Anne Nicol Gaylor complicates the claim of her estate, but only slightly. The IRS never issued a decision on her request for a refund, which, as noted above, qualifies as a denial of her claim, so the estate has standing to seek a refund. Although Anne Nicol Gaylor's death might moot a claim for prospective relief, that has little bearing on the case in light of my conclusion that the other plaintiffs may seek such relief. Ezell v. City of Chicago, 651 F.3d 684, 696 (7th Cir. 2011) ("Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not.").

## B. 2013 Decision

Because plaintiffs are raising the same challenge to § 107(2) that they raised in Freedom from Religion Foundation, Inc. v. Lew, 983 F. Supp. 2d 1051 (W.D. Wis. 2013), it makes sense to review that decision, in which I concluded that § 107(2) violates the establishment clause. (For the remainder of the opinion I will refer to that decision simply

as Lew because it will not be necessary to make any further references to the court of appeals' decision, which was limited to the issue of standing.) First, I reviewed the different tests that courts have applied in cases brought under the establishment clause, including the test set forth in Lemon v. Kurtzman, 403 U.S. 602 (1971), which requires a court to invalidate a law if (1) it has no secular purpose; (2) its primary effect advances or inhibits religion; *or* (3) it fosters an excessive entanglement with religion. As the parties had done, I applied a modified version of the Lemon test that both the Supreme Court and the Court of Appeals for the Seventh Circuit have applied in more recent cases: "whether the government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement, viewed from the perspective of a reasonable observer." Lew, 983 F. Supp. 2d at 1060 (internal quotations and citations omitted).

In concluding that § 107(2) failed that test, I relied on Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 5 (1989), which involved a state sales tax exemption for "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith." A majority of the court concluded that the exemption violated the establishment clause, but no single opinion in the case garnered at least five votes.

The plurality concluded that the exemption did not have a secular purpose or effect and conveyed a message of religious endorsement because it provided a benefit to religious publications only, without a corresponding showing that the exemption was necessary to alleviate a significant burden on free exercise. Texas Monthly, 489 U.S. at 14-15 (plurality opinion) ("[W]hen government directs a subsidy exclusively to religious organizations that

is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion, as Texas has done, it provides unjustifiable awards of assistance to religious organizations and cannot but convey a message of endorsement to slighted members of the community."). The plurality also concluded that the exemption fostered entanglement because it required the government to "evaluat[e] the relative merits of differing religious claims." Id. at 20. In a concurring opinion, two justices concluded that "a tax exemption limited to the sale of religious literature by religious organizations violates the Establishment Clause" because it results in "preferential support for the communication of religious messages." Id. at 28 (Blackmun, J., concurring in the judgment).

I concluded that § 107(2) was invalid under either the plurality or concurring opinion. The provision was invalid under the plurality opinion because it gave an exemption to religious persons without a corresponding benefit to similarly situated secular persons. As to the concurring opinion, "[b]ecause a primary function of a 'minister of the gospel' is to disseminate a religious message, a tax exemption provided only to ministers results in preferential treatment for religious messages over secular ones." Lew, 983 F. Supp. 2d at 1062. In addition to Texas Monthly, other Supreme Court opinions supported the more general view that the government may not provide a benefit that only a group of religious persons may receive. Board of Education of Kiryas Joel Village School District v. Grumet, 512 U.S. 687, 708 (1994) ("[A] statute [may] not tailor its benefits to apply only to one religious group."); Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 708 (1985) (giving employees "unqualified" right not to work on the Sabbath violates establishment clause

because it "takes no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath"); Committee for Public Education v. Nyquist, 413 U.S. 756, 793 (1973) (tax exemptions for parents of children in sectarian schools violated establishment clause because "[s]pecial tax benefits . . . cannot be squared with the principle of neutrality established by the decisions of this Court").

Even if Texas Monthly and these other cases were not dispositive, I concluded that both the purpose and effect of § 107(2) were to endorse religion, in violation of the establishment clause. Two pieces of legislative history supported that conclusion. A House of Representatives committee report issued before the law was passed in 1954 noted that "a minister of the gospel" who is "furnished a parsonage" as part of his compensation receives a tax exemption for the rental value of his home under what is now § 107(1). Lew, 983 F. Supp. 2d at 1067 (quoting H.R. Rep. No. 1337, at 15, available in U.S. Code Congressional and Administrative News, 83rd Congress, Second Session, at 4040 (1954)). The committee viewed this as "unfair" to ministers who receive a housing allowance rather than a home, so the purpose of § 107(2) was to "remove[] the discrimination in existing law by providing that the present exclusion is to apply to rental allowances paid to ministers to the extent used by them to rent or provide a home." Id. At a hearing on the bill, its sponsor in the House, Peter Mack, made the following statement:

> Certainly, in these times when we are being threatened by a godless and anti-religious world movement we should correct this discrimination against certain ministers of the gospel who are carrying on such a courageous fight against this. Certainly this is not too much to do for these people who are caring for our spiritual welfare.

Id. (quoting Hearings Before the H. Comm. on Ways & Means, 83rd Cong. 1, at 1574–75

(June 9, 1953) (statement of Peter F. Mack, Jr.)). I concluded that both the statement and the report showed that the purpose of § 107(2) was to assist a group of religious persons, which is not a secular purpose.

The various arguments raised by the government failed to show that § 107(2) had a secular purpose and effect: (1) § 107(2) was not needed to eliminate discrimination, either among religions or between religious and secular employers; (2) other statutes that granted a tax exemption for a housing allowance to a small subset of secular employees were not instructive because each of those other statutes involved employees who bore special burdens not shared by the general population; (3) § 107(2) could not be justified as a mere "accommodation of religion" because the Supreme Court has held that the payment of a generally applicable tax does not qualify as a substantial burden on free exercise, Jimmy Swaggart Ministries v. Board of Equalization of California, 493 U.S. 378, 391 (1990); and (4) Walz v. Tax Commission, 397 U.S. 664 (1971), a case in which the Supreme Court rejected an establishment clause challenge to a tax exemption, was not instructive because the exemption at issue applied to both religious and secular groups. Lew, 983 F. Supp. 2d at 1063-71.

Finally, I considered the question of entanglement and concluded that Texas Monthly was instructive because both the statute in that case and § 107(2) required the government to "evaluat[e] the relative merits of differing religious claims" and created "[t]he prospect of inconsistent treatment and government embroilment in controversies over religious doctrine." Texas Monthly, 489 U.S. at 20 (plurality opinion). However, I did not decide whether § 107(2) fosters excessive entanglement because it was unnecessary to do so in light

of the conclusion that the provision does not have a secular purpose or effect.  Doe ex rel. Doe v. Elmbrook School District, 687 F.3d 840, 851 (7th Cir. 2012) ("Since we conclude that the District acted unconstitutionally on other grounds, we need not address these arguments, nor must we consider the District's actions under Lemon's entanglement prong.").

In closing, I noted that Congress was "free to rewrite the provision in accordance with the principles laid down in Texas Monthly and Walz so that it includes ministers as part of a larger group of beneficiaries."  Lew, 983 F. Supp. 2d at 1073.

## C.  Defendants' Arguments

Having reviewed the arguments raised by the government and the intervenor defendants in their summary judgment motions, I adhere to the conclusion in Lew that § 107(2) violates the establishment clause.  I considered and rejected most of defendants' arguments in the previous case, so it is unnecessary to address those again.  Instead, I will address defendants' new and more developed arguments.

## 1. Secular purpose and effect

As discussed in Lew and acknowledged by all parties, a key question under the establishment clause is whether the statute at issue has a secular purpose or can be justified on secular grounds.  Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 696 (1989); Wallace v. Jaffree, 472 U.S. 38, 56 (1985); Doe, 687 F.3d at 849; Badger Catholic, Inc. v. Walsh, 620 F.3d 775, 788 (7th Cir. 2010).  The parties devote much of their briefs

to this issue, so it makes sense to focus on that as well.

a. Convenience of the employer doctrine

Some of defendants' arguments regarding possible secular justifications for § 107(2) relate to the "convenience of the employer" doctrine, so I will provide an overview of that doctrine before addressing more specific issues. The basic premise is that certain benefits may be tax exempt if the benefit or the way in which it is conferred serves the convenience of the employer. Kowalski v. Commissioner of Internal Revenue, 434 U.S. 77, 84–90 (1977). In the housing context, the Department of Treasury first applied the doctrine in 1919 to seamen living aboard a ship, using the rationale that housing should not be viewed as compensation if it is provided by the employer to enable an employee to do his job properly. Id. at 84–85. The doctrine was then applied to cannery and hospital workers who received lodging from their employer so that they could be available for work as needed. Id. at 86. See also Adam Chodorow, The Parsonage Exemption 105-06 & n.16 (Jan. 28, 2017) (forthcoming publication), dkt. #61-2 (when employees "must be on-site overnight to perform their jobs . . . providing housing is not compensatory and therefore should be excluded from income"; alternatively, doctrine may reflect "an administrative decision to exclude housing where it is difficult to distinguish between personal consumption and business necessities").

In 1954, Congress codified the exemption in 26 U.S.C. § 119, which allows an employee to exclude from his gross income "the value of any . . . lodging furnished to him,

. . . but only if . . . the employee is required to accept such lodging on the business premises of his employer as a condition of his employment." Congress has never extended § 119 to include housing allowances. In 1976, Congress made housing expenses tax deductible if the home or a portion of it is "exclusively used on a regular basis" for business purposes. 26 U.S.C. § 280A(c)(1).

Defendants devote a significant portion of their briefs to establishing the reasons why it is appropriate to grant ministers tax exemptions under the convenience of the employer doctrine. These arguments are puzzling because neither this court nor plaintiffs have suggested that the doctrine is unavailable to ministers. It is undisputed that § 119 and § 280A(c)(1) are available to anyone who can meet the relevant requirements, including ministers and any other religious employee.

The relevant question for this case is whether it was permissible for Congress to expand the convenience of the employer doctrine for ministers in a manner that eliminated *any* requirement to show that their choice of housing actually is for the convenience of the employer. This is because § 107(2) applies to *all* ministers who receive a housing allowance, regardless whether the minister's home is ever used for church purposes or whether the minister's choice of home is restricted by the church in any way.

By defendants' own assertion, historically churches provided housing to ministers near or on church property because the minister was to be available at all times; the church wanted to control the minister's living conditions so that they were consistent with church teachings; the church's ownership of the home freed the minister to focus on the religious mission rather than home maintenance and made it easier for the church to settle new

ministers.  Govt.'s PFOF ¶ 20, dkt. #44; Int. Dfts.' PFOF ¶ 7, dkt. #52.  However, the government fails to explain how these considerations carry over to a situation involving a housing allowance, particularly when § 107(2) includes no restrictions on the location, cost or use of a minister's home.

Thus, the question is not whether ministers may deduct housing expenses from their gross income under the convenience of the employer doctrine; they undoubtedly can under either § 119 or § 280A. The question is whether the doctrine should apply to ministers even when the reasons for applying it are absent and even though the vast majority of other taxpayers are required to justify their request for an exemption.

Defendants offer four reasons as potential secular purposes for that special treatment: (1) providing for the "unique housing needs" of ministers; (2) eliminating discrimination among religions; (3) reducing entanglement between church and state; and (4) alleviating financial hardship on ministers.  I will consider each in turn.

b. Unique housing needs

Both the government and the intervenor defendants argue that § 107(2) should not be viewed in "isolation," but instead should be considered as simply one small part of a "broad" exemption that employees with "unique housing needs" receive.  Dkt. #47 at 17; Dkt. #53 at 20; Dkt. #68 at 1.  For the reasons explained below, I conclude that the other exemptions defendants cite do not show that § 107(2) has a secular purpose or effect.

It is clear that some of the exemptions do not provide any support for defendants' argument.  The government cites § 280A, but, as discussed above, that provision is already

available to ministers, so it provides no justification for a law that benefits only ministers and under much broader circumstances.

Both the government and the intervenor defendants cite various provisions in § 119, some of which, like § 280A, could be invoked by any secular or religious employee. In any event, all of the provisions in § 119 relate to employer-provided housing rather than to housing allowances. Because § 107(1) (which relates to church-provided housing) is not at issue in this case, § 119 is not instructive.

The intervenor defendants cite 26 U.S.C. § 162(a)(2), which allows a taxpayer to deduct "traveling expenses (including amounts expended for . . . lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business" for up to one year. The language of the provision makes it clear that it applies to *business travel* expenses while a taxpayer is *away* from home. It has nothing to do with a housing allowance for a primary residence. In any event, § 162 is not limited to particular professions, so ministers are free to claim the exemption if they qualify for it.

The remaining provisions are more similar to § 107(2), but still not helpful for defendants. Defendants rely on the same exemptions the government cited in Lew, 26 U.S.C. §§ 134, 911 and 912, which give a tax exemption for housing expenses to federal employees working overseas (§ 912), other Americans working overseas (§ 911) and members of the military (§ 134). For several reasons, I disagree with defendants that § 107(2) and these provisions are part of an "overall effort" or a "broad package of tax exemptions" for "persons whose occupations often require particular housing for job-related

reasons." Dkt. #47 at 19; Dkt. #53 at 21.

First, defendants suggest that Congress considered § 107(2) and these other laws together, but they cite no evidence for that. The only other law that appears in the legislative history cited by the parties is § 107(1). In fact, it appears that Congress enacted § 134 well after it enacted § 107(2), Pub. L. 99-514, Title XI, § 1168(a), Oct. 22, 1986, 100 Stat. 2512, so § 134 could not have influenced § 107(2).

Second, defendants cite no evidence that concerns related to the convenience of the employer doctrine had anything to do with the enactment of § 107(2). Rather, as discussed in Lew and will be discussed further below, the only purposes disclosed in the legislative history are a desire to extend the benefits in § 107(1) to all ministers and provide financial assistance to those "caring for our spiritual welfare" and "carrying on . . . a courageous fight" against "a godless and anti-religious world movement."

Third, the cited laws fail to provide any potential secular justification for § 107(2) because § 107(2) cannot be fairly grouped with those other exemptions. Defendants try to characterize § 107(2) and §§ 134, 911 and 912 as setting forth a general congressional policy for providing a categorical tax exemption to a particular group of employees who "often" have work-related restrictions on their housing, dkt. #47 at 15, but that policy is not reflected in the law. There are many groups of professionals who "often" need to live near their work and be on call even when they are not working, such as certain types of healthcare providers, hotel managers, maintenance staff, funeral service directors and many others. However, none of those groups receive a categorical tax exemption for housing expenses as ministers do. Rather, if those employees wish to exclude housing expenses from their gross

income, they must satisfy the requirements for the convenience of the employer doctrine set out in § 119 or § 280A. Defendants do not even attempt to explain why ministers may be singled out for favorable treatment while similarly situated groups are excluded.

In any event, §§ 134, 911 and 912 bear no relationship to § 107(2). Those statutes do not reflect a general policy regarding employees who "often" have job-related housing requirements. Rather, they are ad hoc determinations by Congress regarding a limited number of employees in specific circumstances. Sections 912 and 134 both relate to federal employees, so the housing tax exemption they receive may be viewed simply as a benefit provided by the employer. The federal government has wide discretion in structuring the way in which it compensates its own employees, so no general policy regarding either religious or secular private employees may be inferred from those statutes. Although private citizens may invoke § 911, this includes ministers, if they are working overseas.

As I noted in Lew, it is particularly inappropriate to draw an inference of a general policy from benefits received by members of the military under § 134, who are *sui generis* as to "the level of service they give to the government and the sacrifices they make." Lew, 983 F. Supp. 2d at 1070. If anything, the fact that members of the military are the only other employees living in the United States who receive an exemption like the one in § 107(2) is strong evidence that § 107(2) demonstrates religious favoritism.

Further, all three of the statutes relate to employees whose housing is *necessarily* affected by their jobs. People who work overseas obviously are required to move for their employer and incur expenses associated with that move. As for service members, intervenor defendants acknowledge that their duties "require [their] physical presence at [their] post

or station; [their] service is continuous day and night; [and their] movements are governed by orders and commands." Dkt. #53, at 25 (quoting Jones v. United States, 60 Ct. Cl. 552, 569 (1925)).

Some ministers may be in a similar situation, including some of the intervenor defendants, but by no means are all ministers so restricted, as is demonstrated by defendants' own expert, religious historian James Hudnut-Beumler. He notes that parsonages were once ubiquitous for churches but became less common as "religious diversity . . . and residential mobility increased." Hudnut-Beumler Dec. ¶ 87, dkt. #57. (In fact, one commentator observes that 87 percent of ministers now receive cash allowances for housing. Chodorow, dkt. #61-2, at 149.) In describing modern trends, the historian stated that a minister's decision to live in a parsonage may be driven by factors such as the state of the housing market in a particular community and the convenience of the *minister*, rather than the needs of the church. Id. at ¶ 104 (at time § 107(2) was enacted, more ministers lived in housing of their own choice because "it was easier [than in previous decades] for them to get a mortgage for a home of their own and easier to sell quickly if called to a new congregation"); id. at ¶ 126 (trend is for churches to have parsonages "in those areas that are expensive"); id. at ¶ 133 (housing allowance gives minister flexibility for "accommodating family size, school district, special needs, disability access"). In fact, despite a lengthy discussion in their proposed findings of fact about past and present housing trends for ministers, defendants include no facts showing that ministers who receive a housing allowance generally are (1) restricted by their churches regarding where they can live or what kind of home they can buy; or (2) required to use their home for church purposes. Thus,

over time it appears that the factors influencing housing choices of ministers have begun to more closely resemble the factors considered by the general public. Even as to the intervenor defendants themselves, only Gregory Joyce stated that his church restricted the location of his housing.

Further, § 107(2) has been applied to employees who bear little resemblance to the intervenor defendants with respect to their duties. One commentator has noted that the IRS has granted the exemption to a rabbi working as a teacher, ministers working as guidance counselors or basketball coaches and every member of the Churches of Christ teaching at a Christian college. Chodorow, dkt. #61-2, at 114 and n. 48 (citing I.R.S. P.L.R. 1991-26-048 (Apr. 2, 1991); I.R.S. P.L.R. 2000-02-040 (Jan. 14, 2000); I.R.S. Rev. Rul. 70-549; and Jobe v. Commissioner, No. 33686-83). This shows that "ministers receive tax benefits unavailable to non-ministers performing the exact same jobs." Id.

In sum, the case is weak for the argument that ministers should receive a blanket exemption on the ground that they have unique housing needs. Even if it is true that ministers often meet the requirements for the convenience of the employer doctrine, the same could be said of other employees not covered by § 107(2) or a comparable exemption. In those other situations, the employee must actually show that she is living in housing for the convenience of the employer. I see no secular justification for eliminating as to one group of religious employees the requirement in the convenience of the employer doctrine that the employee's housing actually serves the convenience of the employer.


c. Eliminating denominational discrimination

Defendants' argument on this issue is a more developed version of the government's argument in Lew. The argument has two components. First, defendants say that Congress enacted § 213(b)(11) of the Revenue Act of 1921 (which later became § 107(1) in 1954), giving a tax exemption to ministers who live in church-provided parsonages, because the Department of Treasury was refusing to grant exemptions to ministers under the convenience of the employer doctrine. (Plaintiffs deny that the department was discriminating against ministers, but I need not resolve that dispute to decide this case.) Second, in 1954, Congress enacted § 107(2) to eliminate discrimination between ministers who lived in parsonages and ministers who received a housing allowance. H.R. Rep. No. 1337, at 15, available in U.S. Code Congressional and Administrative News, 83rd Congress, Second Session, at 4040 (1954) (purpose of § 107(2) is to "remove[]" or "correct" the "discrimination" in existing law between ministers who live in parsonages and those who receive housing allowance).

Viewed from a distance, defendants' argument has surface appeal, as both steps in the process appear to be straightforward attempts to make the law more equitable. However, a closer look reveals that the enactment of § 107(1) provides no justification for § 107(2).

As to the first step, it is apparent from the language of § 107(1) that it goes beyond simply codifying the convenience of the employer doctrine for ministers. Section 107(1) is missing the requirements in § 119 that the lodging is located "on the business premises of his employer" and offered "as a condition of his employment." Thus, the exemption in § 107(1) for ministers is broader than what most other employees receive. It seems counterintuitive to argue that, because Congress enacted one broad exemption that favored

ministers in § 107(1), it was justified in enacting § 107(2), which is an even *more* expansive exemption that provided an even greater benefit to ministers and made the disparity between ministers and secular employees that much wider.

As in <u>Lew</u>, § 107(1) is not at issue in this case. Accordingly, I do not consider whether § 107(1) violates the establishment clause and I will assume that defendants are correct in asserting that the purpose of § 107(1) was simply to insure that ministers received an exemption that secular employees already had. Making that assumption, however, does not help defendants justify § 107(2).

Defendants say that § 107(2) was about insuring equal treatment among all religions rather than eliminating discrimination between ministers and secular employees, but that rationale has multiple problems. First, defendants cite no authority for the view that the government may eliminate a perceived disparity among religions by *creating* (or exacerbating) a disparity between religious persons and secular persons. If Congress believed that it was unfair to treat employees with housing allowances differently from employees who live on employer-owned property, it could have enacted a statute that allowed *all* similarly situated employees, both secular and religious alike, to exclude a housing allowance from their gross income rather than targeting "ministers of the gospel" alone for more favorable treatment.

Second, as I noted in <u>Lew</u>, 983 F. Supp. 2d at 1068, § 107(1) did not need to be "corrected" because it does not discriminate on the basis of religious denomination. *All* statutes are "discriminatory" in the sense that each provides a benefit or imposes a restriction on some persons but not on others. However, by defendants' own assertion, the point of § 107(1) (and its precursor § 213(b)(11)) was not to give certain denominations

more favorable treatment. Rather, it simply was an attempt to extend to ministers the convenience of the employer doctrine, which recognizes that employer-provided housing may benefit the employer just as much as the employee, so the value of that housing should not be considered compensation. With respect to the vast majority of employees, Congress has not extended the doctrine to housing allowances, presumably because those employees have much greater freedom in choosing their own housing. Limiting the application of the doctrine to employees who meet its requirements is not invidious discrimination against secular *or* religious employees; it is simply a recognition that a taxpayer may not obtain a benefit in the absence of a justification for receiving the benefit.

"Under defendants' view, if one religious person received a tax exemption, then Congress would be compelled to give every religious person the same exemption, even if the exemption had nothing to do with religion." Lew, 983 F. Supp. 2d at 1068. For example, churches must comply with any number of requirements and restrictions to be tax exempt under 26 U.S.C. § 501(c)(3): net earnings may not "inure[] to the benefit of any private shareholder or individual"; lobbying activities are limited; and participation in political campaigns is prohibited. Because some churches may not be able to comply with these requirements, defendants' logic suggests that Congress should eliminate them.

Intervenor defendants argue that Congress was *required* to enact § 107(2), citing Larson v. Valente, 456 U.S. 228, 230 (1982), for the proposition that the First Amendment prohibits more than just intentional religious discrimination. In Larson, 456 U.S. at 230, the Court invalidated a law "imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from

nonmembers." Intervenor defendants say that, like the statute in <u>Larson</u>, § 107(1) favors "well established" and "wealthy" churches because those churches have the means to buy a parsonage. However, the Court did not adopt a "disparate impact" standard in <u>Larson</u> as intervenor defendants suggest. Rather, the Court found that "the history of [the challenged law] demonstrate[d] that the provision was drafted with the explicit intention of including particular religious denominations and excluding others." <u>Id.</u> at 253–54. In this case, defendants do not contend that Congress enacted § 107(1) or § 213(b)(11) to help some denominations or hurt others.

Intevenor defendants also cite no cases in which a court relied on <u>Larson</u> to either justify a statute that showed favoritism toward religious persons or invalidate a statute that required religious persons to meet the same requirements as everyone else to obtain a government benefit. Rather, the Court has cited <u>Larson</u> almost exclusively for the proposition that "one religious denomination cannot be officially preferred over another." <u>E.g.</u>, <u>Grumet</u>, 512 U.S. at 714; <u>County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter</u>, 492 U.S. 573, 605 (1989). <u>See also</u> <u>Lynch v. Donnelly</u>, 465 U.S. 668, 687 n.13 (1984) (O'Connor, J., concurring) (<u>Larson</u> applies to "explicitly discriminatory" statutes). Section 107(1) does not discriminate on the basis of denomination, either on its face or by design.

More instructive is <u>Hernandez</u>, 490 U.S. at 686, in which the Court rejected an argument under <u>Larson</u> that 26 U.S.C. § 170 discriminates against minority religions such as the Church of Scientology by making payments to a church ineligible for a tax deduction if they were made for a particular service (in that case a service called "auditing") rather

30

than for membership in the church. Like the statute at issue in <u>Hernandez</u>, § 107(1) does not discriminate against certain religions; it is simply limiting a well-established principle of tax law to employees who meet the criteria for obtaining an exemption.

Even if I were to assume that § 107(1) discriminates against less established or wealthy churches in the sense discussed in <u>Larson</u>, § 107(2) was not an appropriate response to that discrimination, for two reasons. First, § 107(2) goes much further than any concern about churches who could not afford to purchase a parsonage. If that were the only concern, Congress could have created an exemption for rental housing that is provided by the church or is subject to restrictions imposed by the church. By divorcing the exemption from any connection to the convenience of the employer doctrine, Congress revealed that its true purpose was to demonstrate a religious preference. In fact, the benefit ministers receive under § 107(2) is potentially greater than that received under § 107(1) because a minister can use his housing allowance to purchase a home that will appreciate in value and he can deduct any interest he pays on his mortgage and property taxes. 26 U.S.C. § 265(a)(6); Erwin Chemerinsky, <u>The Parsonage Exemption Violates the Establishment Clause and Should Be Declared Unconstitutional</u>, 24 Whittier L. Rev. 707, 723 (2003).

Second, as I noted in <u>Lew</u>, 983 F. Supp. 2d at 1068, if § 107(1) is discriminatory, then so is § 107(2), because both provisions "discriminate" against religions that do not have ministers that meet the IRS's definition of that term. The government resists this conclusion on the ground that, "if a religion has no ministers then there is no taxation of a minister's housing that needs to be accommodated," dkt. #47 at 16 n.3, but that argument is self-defeating. Regardless whether a church has a "minister" who receives a housing allowance,

it may have other employees who do and who need and deserve a housing tax exemption just as much as a minister does. The government may mean to argue that discrimination between ministers and other religious employees is not a problem because those other employees are less likely to live in housing for the convenience of the employer and therefore should not qualify for the exemption. If that is the argument, then it supports this court's conclusion that declining to extend an exemption to all ministers does not raise a constitutional red flag if the reason is simply that the minister fails to qualify for the exemption.

In short, it is simply inaccurate to say either that § 107(1) discriminates against particular religious denominations or that § 107(2) corrects any discrimination in § 107(1). Rather, Congress' statement that it was "unfair" to make ministers pay taxes on a housing allowance is simply an admission that it wanted to provide aid to a group of religious persons. That purpose is confirmed by the sponsor's statement that § 107(2) was needed to "fight against" a "godless and anti-religious world movement." Because that is not a secular purpose, it cannot justify § 107(2) under the establishment clause.

d. Entanglement

In addition to secular purpose and effect, courts deciding a claim under the establishment clause sometimes consider whether a statute fosters "excessive entanglement" between government and religion. E.g., Agostini v. Felton, 521 U.S. 203, 233 (1997); Sherman ex rel. Sherman v. Koch, 623 F.3d 501, 519 (7th Cir. 2010). In Lew, I observed that § 107(2) appeared to be similar to the exemption struck down in Texas Monthly,

because a ruling under § 107(2) involves a complex and inherently ambiguous multifactor test. Compare Silverman v. Commissioner of Internal Revenue, 57 T.C. 727, 731-32 (1972) (Jewish cantor was "minister" for tax purposes because he performed religious worship, sacerdotal training and educational functions as specified by Jewish religious tenets), with Lawrence v. Commissioner of Internal Revenue, 50 T.C. 494, 499-500 (1968) (commissioned but not ordained Baptist minister of education was not "minister" because he was unable to officiate at baptisms, preside over or preach at worship services or take part in other aspects of Baptist services). See also Lew, 983 F. Supp. 2d at 1057 (citing cases in which tax court has applied four different tests for determining whether taxpayer is a "minister"). However, I did not decide whether § 107(2) fosters excessive entanglement because it was unnecessary in light of my conclusion that the provision does not have a secular purpose or effect.

Defendants now make the opposite argument: § 107(2) does not foster excessive entanglement; it *avoids* the entanglement that would be fostered if ministers would be required to comply with the requirements for the convenience of the employer doctrine that apply to most secular employees. Defendants say that the alleged administrative advantages of § 107(2) are themselves a secular justification for the law.

Defendants have not made a persuasive argument on this point. To begin with, defendants cite no evidence that concerns about entanglement had anything to do with § 107(2) and they cite no authority for the view that concerns about entanglement can justify preferential treatment for religious persons. Also, much of intervenor defendants' argument relates to alleged difficulties with applying *§ 119* to ministers. As noted above, §

119 applies to employees who are required to live in employer-provided housing. Because the provision that applies to ministers who live in employer-provided housing, § 107(1), is not at issue in this case, § 119 is not relevant.

Other than §§ 134, 911 and 912 (all of which are discussed above), the parties identify no federal statutes that allow secular employees to exclude a housing allowance from their gross income. The government suggests that the closest analogue to § 107(2) for most employees is 26 U.S.C. § 280A(c)(1), which allows any employee (secular or religious) to deduct her housing expenses from her gross income if the home or a portion of it is "exclusively used on a regular basis" for business purposes.

Although the government argues generally that § 280A involves "intrusive inquiries," dkt. #47 at 2, it fails to explain how those inquiries are any more intrusive for ministers than they are for any secular employee who wants the exemption. Equally important, defendants make conclusory allegations that applying § 280A to ministers would require the government to answer difficult religious questions and interfere with a minister's exercise of religion, but fail to develop the argument or provide likely scenarios in which that would occur. Cf. Illinois Bible Colleges Association v. Anderson, 870 F.3d 631 (neutral educational licensing requirements did not foster excessive entanglement; "allowing a religious institution to participate in secular regulatory schemes simply does not violate the Establishment Clause.") (internal quotations omitted). After all, unlike § 107(2), § 280A on its face does not require the government to make any religious determinations. Further, it seems likely that church employees who are not ministers seek exemptions under § 280A when it is applicable. Defendants do not identify any entanglement problems that have arisen in that context.

Certainly, defendants have not shown that applying § 280A is any more intrusive or difficult than applying § 107(2).

Even if it is assumed that it would be difficult to apply § 280A to ministers, it does not follow that the solution is to give them preferential treatment. Section 280A did not even exist when Congress enacted § 107(2), so it should not be viewed as the only alternative. If Congress is concerned about entanglement issues surrounding § 280A, it could enact a law that liberalized the exemption for everyone or for a class (such as nonprofit organizations) that is "broad [enough] that it can be fairly concluded that religious [persons] could be thought to fall within the natural perimeter." Texas Monthly, 489 U.S. at 17 (plurality opinion) (internal quotations omitted). Thus, regardless whether § 107(2) fosters excessive entanglement between the government and religion, any concern about avoiding entanglement does not provide a secular justification for the law.

e. Hardship on ministers

Intervenor defendants say that "[i]mposing additional taxes on ministers' housing allowances would interfere with the ability of churches to carry out their religious missions by diverting scarce resources away from their core First Amendment activities." Dkt. #53 at 15. They cite evidence regarding the potential financial effects that invalidating § 107(2) would have on them and they argue that the statute is a permissible accommodation of the free exercise of religion.

It is likely that when § 107(2) was enacted, some members of Congress shared intervenor defendants' concerns about financial hardship on ministers. Plaintiffs cite a

statement from the law's sponsor, who observed that "many . . . clergymen support families like the rest of us"and "must pay 1953 rents for a dwelling house," but "receive low income based on the 1940 cost of living." Hearings Before the H. Comm. on Ways & Means, 83rd Cong. 1, at 1576 (June 9, 1953) (statement of Peter F. Mack, Jr.).

I do not doubt that many ministers are paid significantly less than what their commitment and skill level would suggest. This is an unfortunate truth that applies to many devoted and talented employees in service professions, both religious and secular. However, the manner in which Congress alleviated a financial burden on a group of religious persons was neither required by the free exercise clause nor permitted by the establishment clause under the facts of this case.

As an initial matter, § 107(2) is not limited to ministers with a relatively low income. In 2002, in the midst of a controversial case of a minister who sought a $100,000 exemption under § 107(2), Congress limited the amount of the exemption to the fair rental value of a home. Warren v. Commissioner of Internal Revenue, 114 T.C. 343, 345 (2000); Clergy Housing Allowance Clarification Act of 2002, Pub. L. No. 107–181, 116 Stat. 583. However, the 2002 amendment placed no limit on how expensive that home may be.

As long ago as 1984, the Department of the Treasury acknowledged that one result of § 107(2) is to give "a disproportionately greater benefit to relatively affluent ministers, due to the higher marginal tax rates applicable to their incomes." U.S. Dept. of Treasury, Tax Reform for Fairness, Simplicity, and Economic Growth: The Department Report to the President, vol. II 49 (1984). Thus, an evangelist with a multimillion dollar home is entitled under § 107(2) to deduct the entire rental value of that home, even if it is not used for

church purposes.  E.g., Chodorow, dkt. #61-2, at 116 n.4 ("Joel Osteen lives in a $10.5 million home and is entitled to exclude the fair rental value of that home so long as he spends that money on the home and his church allocates that amount to housing.").  If Congress were concerned about lessening the tax burden on poor Americans, it could have tied the exemption to income and made it generally available to any employee who qualified rather than to all ministers who receive a housing allowance.  Nyquist, 413 U.S. at 788–89 (law motivated by desire to help "low-income parents" send children to sectarian schools "can only be regarded as one 'advancing' religion").

In any event, as I noted in Lew, the mere payment of a generally applicable tax does not qualify as a substantial burden on free exercise. Jimmy Swaggart Ministries, 493 U.S. at 391 ("[T]o the extent that imposition of a generally applicable tax merely decreases the amount of money appellant has to spend on its religious activities, any such burden is not constitutionally significant.").  Because "the burden of taxes is borne equally by everyone who pays them, regardless of religious affiliation, . . . concerns about free exercise do not justify a special exemption."  Lew, 983 F. Supp. 2d at 1063.  See also  Tax Reform for Fairness, supra at 49 ("There is no evidence that the financial circumstances of ministers justify special tax treatment. The average minister's compensation is low compared to other professionals, but not compared to taxpayers in general.").  Accordingly, the potential financial impact that the loss of a tax exemption might have on some ministers is not a factor that I may consider in assessing the validity of § 107(2).


2. Exemption versus subsidy

Defendants repeat an argument the government made in <u>Lew</u>, which is that tax exemptions do not raise the same concerns under the establishment clause that tax subsidies do. The parties cite dueling Supreme Court decisions on the question whether subsidies and exemptions are simply two sides of the same coin. <u>Compare</u>, <u>e.g.</u>, <u>Regan v. Taxation with Representation of Washington</u>, 461 U.S. 540, 544 (1983) ("Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system."), <u>with</u> <u>Walz</u>, 397 U.S. at 675 ("The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state.").

Although these cases may suggest that the Supreme Court does not always see exemptions and subsidies as identical, exemptions do not simply get a "pass" under the establishment clause, as <u>Texas Monthly</u> made clear. As I noted in <u>Lew</u>, 983 F. Supp. 2d at 1065, if one were to take defendants' argument to its logical conclusion, it would permit the government to eliminate *all* taxes for religious organizations and individuals without any secular purpose for doing so, an extreme position that defendants do not advance.

Intervenor defendants identify the appropriate standard for evaluating a religious exemption: whether the exemption "alleviate[s] significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Dkt. #53 at 14 (quoting <u>Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos</u>, 483 U.S. 327, 335 (1987)). <u>See also</u> <u>Grumet</u>, 512 U.S. at 705 ("The Constitution allows the State to accommodate religious needs by alleviating special burdens.") (emphasis added). For example, in <u>Amos</u>, 483 U.S. at 335, the Court upheld a religious exemption in

an antidiscrimination law that otherwise would have required religious groups to violate their own religious beliefs, such as by requiring Catholic churches to ordain women as priests. And in Cutter v. Wilkinson, 544 U.S. 709 (2005), the Court concluded that a law requiring administrators to provide religious accommodations to persons housed in state institutions was justified by the reality of institutionalization, which is "severely disabling to private religious exercise." Id. at 720–21. "[I]n both situations, the accommodations are best described not as singling out religious persons for more favorable treatment, but as an attempt to prevent inequality caused by government-imposed burdens." Lew, 983 F. Supp. 2d at 1063.

Although intervenor defendants invoke the standard cited above for permissible religious accommodations, they fail to apply that standard to their own situation. Of course, invalidating § 107(2) could divert some of a minister's resources from endeavors that could further a church's mission, but the same would be true of *any* tax, just as taxes on secular employees divert their resources from other endeavors that are important to them. As noted above, the Supreme Court has held that generally applicable taxes do not impose a constitutionally significant burden on a taxpayer's rights under the free exercise clause. Jimmy Swaggart Ministries, 493 U.S. at 391. Thus, the payment of such taxes does not qualify as "significant governmental interference" with religious exercise and exemptions from such taxes cannot be viewed merely as a religious accommodation. Rather, because the government has eliminated a burden for certain ministers that is shared by millions of taxpayers, the exemption is more accurately viewed as religious favoritism.

3.  <u>History of religious tax exemptions</u>

Intervenor defendants cite cases such as <u>Town of Greece, New York v. Galloway</u>, 134 S. Ct. 1811, 1819 (2014), for the proposition that "the Establishment Clause must be interpreted by reference to historical practices and understandings."  In light of that principle, intervenor defendants say that "[o]ver 200 years of unbroken history confirm that religious tax exemptions are fully consistent with the historical meaning of the Establishment Clause."  Dkt. #53 at 12.

Intervenor defendants' reliance on cases such as <u>Town of Greece</u> is unavailing because the history cited by intervenor defendants (which comes mostly from discussions in <u>Walz</u>, 397 U.S. 664) relates to church property tax exemptions, not to income tax exemptions of church employees.  Bryce Langford, <u>The Minister's Housing Allowance: Should It Stand, and If Not, Can Its Challengers Show Standing?</u>, 63 U. Kan. L. Rev. 1129, 1163 (2015) ("[Section 107(2)] is a federal income tax exemption, and tax exemptions from federal income taxes do not have an historical and rooted tradition.").  The principle in <u>Town of Greece</u> is limited to situations in which "history shows that the *specific practice* is permitted," 134 S. Ct. at 1819 (emphasis added), so intervenor defendants cannot generalize that all religious tax exemptions are permissible simply because one type of exemption has historical support.  Particularly because defendants attempt to justify § 107(2) as part of the convenience of the employer doctrine, a doctrine that bears no relationship to church property tax exemptions, historical treatment of those exemptions is not instructive.  If all religious tax exemptions were permissible as a matter of historical practice, <u>Texas Monthly</u> and <u>Nyquist</u> would have turned out differently.

Congress enacted § 107(2) in 1954, so it is not brand new. However, the question the Court asked in <u>Town of Greece</u> (as well as in <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), on which <u>Town of Greece</u> relies) was whether the "practice . . . was accepted by *the Framers* and has withstood the critical scrutiny of time and political change." 134 S. Ct. at 1819 (emphasis added). Section 107(2) is not entitled to any special presumptions on account of history, particularly because the statute has evaded judicial scrutiny for a variety of procedural reasons for decades. <u>E.g.</u>, <u>American Atheists, Inc. v. Shulman</u>, 21 F. Supp. 3d 856 (E.D. Ky. 2014) (dismissing challenge to § 107 for lack of standing); <u>Freedom From Religion Foundation, Inc. v. Geithner</u>, Case No. 2:09-2894-WBS-DAD (C.D. Cal.), dkt. ##87-88 (dismissing challenge to § 107 after theory of taxpayer standing rejected by Supreme Court); <u>Warren v. Commissioner of Internal Revenue</u>, 302 F.3d 1012, 1014 (9th Cir. 2002) (denying taxpayer's motion to intervene to challenge § 107 after parties settled dispute); <u>Kirk v. Commissioner of Internal Revenue</u>, 425 F.2d 492, 495 (D.C. Cir. 1970) (declining to consider constitutional challenge to § 107 in deficiency proceeding on ground that court could not "properly consider these issues in this proceeding, particularly in view of the fact that appellants would not in any event be entitled to the exclusion" if they were successful on their claim).

4. <u>Effect on other statutes</u>

Finally, intervenor defendants say that invalidating § 107(2) will "endanger scores of tax provisions throughout federal and state law." Dkt. #53 at 48. Despite that broad statement, intervenor defendants discuss only one provision, 26 U.S.C. § 1402(e), which

grants an exemption for the self-employment tax to certain ministers who are "conscientiously opposed to, or because of religious principles . . . opposed to, the acceptance . . . of any public insurance."

Neither § 1402 nor any religious exemption other than § 107(2) is before the court, so I do not decide whether any of those other provisions violate the establishment clause. However, § 1402(e) is readily distinguishable from § 107(2) on two grounds, as I noted in Lew, 983 F. Supp. 2d at 1062-63. First, as is clear from the language of the provision, it applies only when paying the tax would force the minister to violate his religious beliefs, so it may be properly viewed as an accommodation of religion rather than preferential treatment. Chodorow, dkt. #61-2, at 155-56. In contrast, § 107(2) is not tied to a minister's particular religious beliefs about paying taxes and intervenor defendants do not argue that they have religious objections to paying taxes on their housing expenses.

Second, as is also clear from the face of § 1402(e), the exemption applies not simply to ministers who object to *paying* the self-employment tax but to *receiving* public insurance. Because it is unlikely that a minister claiming an exemption under § 1402(e) will receive the benefits the tax is designed to fund, the exemption may ultimately provide no net benefit to the minister. It is for these reasons that courts have upheld § 1402 against establishment clause challenges. Droz v. Commissioner of Internal Revenue, 48 F.3d 1120, 1121 (9th Cir.1995) (§ 1402 is permissible accommodation because it is "an exemption narrowly drawn to maintain a fiscally sound Social Security system and to ensure that all persons are provided for, either by the Social Security system or by their church"); Hatcher v. Commissioner of Internal Revenue, 688 F.2d 82, 84 (10th Cir.1979) ("That the principal

purpose of the legislation is not to advance or inhibit religion is evident in the mandate that those who receive the exemption forego the benefit of the program.").

## D. Conclusion

Having considered all of the arguments advanced by defendants, I am not persuaded either that it was an error to conclude in Lew that § 107(2) is unconstitutional or that any new facts or law support a different conclusion. Defendants' stated concerns about treating religions equally and avoiding entanglement do not find any support in the facts or the law. Thus, any reasonable observer would conclude that the purpose and effect of § 107(2) is to provide financial assistance to one group of religious employees without any consideration to the secular employees who are similarly situated to ministers. Under current law, that type of provision violates the establishment clause.

In reaching this conclusion, I do not mean to imply that any particular minister is undeserving of the exemption or does not have a financial need for one. The important point is that many equally deserving secular employees (as well as other kinds of religious employees) could benefit from the exemption as well, but they must satisfy much more demanding requirements despite the lack of justification for the difference in treatment.

As I have discussed throughout this opinion, Congress could have enacted a number of alternative exemptions without running afoul of the First Amendment. For example, Congress could have accomplished a similar goal by allowing any of the following groups to exclude housing expenses from their gross income: (1) all taxpayers; (2) taxpayers with incomes less than a specified amount; (3) taxpayers who live in rental housing provided by

the employer; (4) taxpayers whose employers impose housing-related requirements on them, such as living near the workplace, being on call or using the home for work-related purposes; or (5) taxpayers who work for nonprofit organizations, including churches. Or some of these categories could be combined. One commentator has suggested that § 107 be amended to apply to taxpayers who work for tax exempt organizations under § 501(c)(3) and are on call at all times. Ellen P. Aprill, Parsonage and Tax Policy: Rethinking the Exclusion, 96 Tax Notes 1243 (Aug. 26, 2002).

Of course, these suggestions are not exhaustive. Congress retains wide discretion in adopting tax laws that further its legitimate policies. What Congress may not do is single out religious persons for preferential treatment without a secular basis for doing so, as it has done in § 107(2).

### E. Remedy

In Lew, both the parties and the court assumed that the only available relief was declaring § 107(2) unconstitutional and enjoining its enforcement. That remains part of plaintiffs' request for relief, but now plaintiffs have raised the possibility of other types of relief as well.

First, now that the IRS has denied Gaylor's and Barker's request for a refund, plaintiffs suggest that they may be entitled to a refund and an injunction requiring the IRS to "extend benefits under the statute to those excluded." Dkt. #65 at 10. (Intervenor defendants question plaintiffs' right to obtain a refund because that request was not included in their complaint, but that argument is inconsistent with circuit law. Heitmann v. City of

Chicago, Illinois, 560 F.3d 642, 645 (7th Cir. 2009) ("Prevailing parties get the relief to which they are entitled, no matter what they ask for.").)  Second, earlier in the case plaintiffs argued that "the invalidity of § 107(2) may later involve the Court in determining whether § 107(1) is, or is not, severable when evaluating any potential remedies that may be warranted," dkt. #13 at 2, suggesting that invalidating § 107(2) may require invalidating § 107(1) as well.

It seems unlikely that it would be appropriate for the court to issue an injunction directing the IRS to extend the scope of the exemption because, as noted above, there are multiple ways that the statute could be rewritten, a task generally left for Congress.  Virginia v. American Booksellers Association, Inc., 484 U.S. 383, 397 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements.").  Invalidating § 107(1) along with § 107(2) also seems to stretch the limits of judicial power, particularly because a statute similar to § 107(1) existed without § 107(2) for more than 30 years.  Executive Benefits Insurance Agency v. Arkison, 134 S. Ct. 2165, 2173 (2014) ("We ordinarily give effect to the valid portion of a partially unconstitutional statute so long as it remains fully operative as a law, and so long as it is not evident from the statutory text and context that Congress would have preferred no statute at all.") (internal quotations and citations omitted).

Despite my skepticism on these issues, I am reluctant to make a definitive determination regarding the appropriate remedy because none of the parties developed an argument in favor of a refund, a particular injunction or both or otherwise developed an argument regarding what the court should do in the event that it concludes that § 107(2) is unconstitutional.  Accordingly, I will issue declaratory relief and give the parties an

opportunity to file supplemental materials regarding what additional remedies are appropriate, if any.  In addition, the parties should address the question whether relief should be stayed pending a potential appeal.


ORDER

IT IS ORDERED that

1.  Christopher Butler's motion to intervene, dkt. #81, is GRANTED.

2.  The motions for summary judgment filed by defendants Jacob Lew (now Steve Mnuchin), John Koskinen and the United States of America, dkt. #43, and intervenor defendants Bishop Edward Peecher, Chicago Embassy Church, Father Patrick Malone, Holy Cross Anglican Church, the Diocese of Chicago and Mid-America of the Russian Orthodox Church Outside of Russia and Christopher Butler, dkt. #48, are DENIED.

3.  On the court's own motion, summary judgment is GRANTED to plaintiffs Freedom from Religion Foundation, Annie Laurie Gaylor, Dan Barker and Ian Gaylor as the personal representative of the estate of Anne Nicol Gaylor.

4. It is DECLARED that 26 U.S.C. § 107(2) violates the establishment clause of the First Amendment to the United States Constitution.

5. The parties may have until October 30, 2017, to file supplemental briefs on the questions whether any additional remedies are appropriate and whether relief should be stayed pending a potential appeal. Response briefs are due November 8, 2017. There will be no reply. If the parties do not respond by the deadline, I will direct the clerk of court to enter judgment without awarding any additional relief.

6. All relief is STAYED pending entry of judgment.

Entered this 6th day of October, 2017.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge